# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-DR-01796-SCT

*LESLIE GALLOWAY, III a/k/a LESLIE
GALLOWAY a/k/a LESLIE "BO" GALLOWAY, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/24/2010 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: MARY JO WOODS |
| |     KRISSY CASEY NOBILE |
| | HENDERSON HILL |
| | CLAUDIA VAN WYK |
| ATTORNEY FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PARKER ALAN PROCTOR, JR. |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 10/05/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. A Harrison County jury of Leslie "Bo" Galloway's peers found Galloway to be guilty of the capital murder of Shakeylia Anderson. The four aggravating factors the jury found were: (1) that Galloway was engaged in sexual battery; (2) that Galloway was a person under sentence of imprisonment at the time; (3) that Galloway was a felon previously convicted of an offense involving the use of threat of violence to another person; and (4) that the murder

was especially heinous, atrocious, or cruel. The jury subsequently determined that Galloway should be sentenced to death by lethal injection.

¶2. Galloway's conviction and sentence were affirmed by this Court on direct appeal. *Galloway v. State*, 122 So. 3d 614 (Miss. 2013). His motion for rehearing was subsequently denied, and he sought relief in the United States Supreme Court by way of a petition for writ of certiorari, which was denied on May 27, 2014. *Galloway v. Mississippi*, 572 U.S. 1134, 134 S. Ct. 2661, 189 L. Ed. 2d 209 (2014). Galloway now comes before this Court with his Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief and his subsequently filed Motion for Leave to Proceed in the Trial Court with Amended Petition for Post-Conviction Relief. We treat both filings together as one and refer to it as Galloway's amended petition for post-conviction relief. Finding no error, we deny his amended petition.

## FACTS AND PROCEDURAL HISTORY

¶3. The following factual and procedural background are gleaned from this Court's opinion on direct appeal:

> On the evening of Friday, December 5, 2008, seventeen-year-old Shakeylia Anderson and her cousin Dixie Brimage were at their grandmother's house in Gulfport, Mississippi, talking and doing each other's hair. Their uncle, Alan Graham, stopped by briefly. When Graham entered the house, he heard a phone ringing in the living room. He looked at the phone and saw the incoming call was from "Bo." Graham walked through the house and found Anderson and Brimage hanging out in a bedroom. Graham mentioned that someone's phone was ringing, and Anderson said it was hers. Graham overheard Anderson on the phone and got the impression that she was getting ready to go out and meet someone.

2

At approximately 10:00 that evening, Anderson walked out of her grandmother's house. She was wearing a jacket, blue jeans, and brown boots and carried her book bag with her. Brimage watched Anderson through her grandmother's glass front door as Anderson walked toward a white Ford Taurus parked in the driveway. Brimage saw Anderson stand by the car for a moment and talk to a man. After about five minutes, Anderson got in the white Ford Taurus with the man, and the vehicle drove away.

The following evening, Martin Smith was hunting with dogs in a secluded, wooded area located west of Highway 15 in northern Harrison County. Smith was searching for one of his dogs that had strayed from the pack when he came across an unclothed dead body lying on a dirt logging road. Smith then called law-enforcement personnel.

Shortly before midnight that same evening, Investigator Michelle Carbine of the Harrison County Sheriff's Department received a call that a body had been found in a wooded area. Carbine arrived at the scene in the early morning hours of December 7, 2008. It was too dark to begin processing the body, so Carbine decided to secure the crime scene and wait until daylight. Carbine returned to the scene around 6:30 a.m. that morning with evidence technician Nancy Kurowski and medical examiner Dr. Paul McGarry. They found the naked body of a black female lying in the middle of a logging path. Carbine said that the deceased female had a red tint to her body, missing hair, and blood underneath the facial area. The body was smeared with blood and dirt, partially burned, and mangled with scrapes, gouges, and lacerations. The body bore at least three tire marks.

Near the scene of the body, investigators found a burned patch of grass and drag marks indicating that something or someone had been dragged from this area to the spot where the body lay. As they walked back toward the body, officials found broken glass from a bottle of New Amsterdam gin and a burned piece of cloth. Pieces of glass were recovered. Numerous tire tracks were near and in a turning pattern around the female's body. Photographs and impressions of the tracks were made and measurements were taken. Based on the condition of the body and the crime scene, Dr. McGarry theorized that the female had been run over by a vehicle, most likely a car.

After some investigation, Carbine determined that the deceased female was Anderson. Based on Brimage's description of the man with whom Anderson had left that Friday evening, and Graham's recollection of "Bo"

3

calling Anderson's phone, as well as information from friends and family, Carbine began looking for a light-skinned black male, approximately five feet, five inches tall, from the Moss Point area, nicknamed "Bo," who drove a white Ford Taurus.

On the evening of December 9, 2008, Lieutenant Ken McClenic of the Jackson County Sheriff's Department received information that Harrison County was looking for a black man with the nickname "Bo" who drove a white Ford Taurus. Through his investigation, McClenic identified Leslie Galloway as a possible suspect. Having obtained a residential address for Galloway, McClenic drove by and observed a white Ford Taurus in the driveway. McClenic and other deputies began conducting surveillance of the residence. Later that same evening, the white Ford Taurus was reported leaving the residence. Officers stopped the vehicle a short distance away. Galloway and Cornelius Triplett, a friend of Galloway's, were inside the vehicle. Galloway was placed under arrest.

Carbine responded to the scene. Carbine walked around the Taurus and noticed a small piece of possible evidence flapping underneath the passenger side. Since the vehicle was going to be towed and Carbine feared the substance might be lost, she collected the item. Officers also noticed some broken glass on the lip of the trunk. The vehicle was then towed and secured at Bob's Garage. A search warrant for the car was obtained and executed by Kurowski and two other investigators. When the vehicle was raised on a lift, officers noted that one side of the undercarriage appeared to be wiped cleaner than the other. Pursuant to a second search warrant, the car was turned over to the Harrison County Sheriff's Department and taken to a work center for processing.

Kurowski processed the car. For comparison to the tire impressions taken from the crime scene, Kurowski made tread impressions of the white Ford Taurus. The tire tracks at the crime scene matched the type of tire on the white Ford Taurus Galloway was driving when he was arrested. From the interior of the car, Kurowski collected blood located just above the trunk-release latch and blood from the left rear passenger door near the door handle. From different places underneath the car, Kurowski collected several pieces of a stringy tissue-like substance. Both the blood and the tissue substances were matched to Anderson's DNA.

A search warrant was obtained and executed for Galloway's residence.

4

There, officers seized a pair of Nike shoes, an Atlanta Braves baseball hat, a Burger King shirt with the name tag "Bo," and an empty bottle of New Amsterdam gin. DNA testing revealed the presence of Anderson's DNA on the shoes and on the baseball hat.

During the autopsy, Dr. McGarry collected additional physical and biological evidence from Anderson's body, including swabs of her anal and vaginal cavities. Analysis of the vaginal swab indicated the presence of DNA from Anderson, Galloway, and James Futch. Futch was Anderson's boyfriend, who admitted that he had sexual intercourse with her days prior to her disappearance and death. As part of his examination, Dr. McGarry noted that Anderson had a dilated vagina—indicative of sexual activity—and her anus had stretching injuries including abrasions, rubbing of the lining, and a fresh tear—three quarters of an inch by one quarter of an inch—characteristic of forceful anal penetration. Dr. McGarry concluded that the anal tear had been caused by forceful sexual penetration. He reasoned that the tear could not have been caused by being run over or crushed by the automobile, because Anderson's rectum was intact—or had not been penetrated by any broken bones—but was naturally in a protected area of the body. Dr. McGarry also explained that the tear was not caused by some foreign object, such as a metal or wooden instrument, because the rubbing and stretching injuries to the rectum were not consistent with jamming, ripping, or irregular injuries that would be associated with penetration by that type of object. The injury to her anus involved much more subtle characteristics.

Days after his arrest, on December 10, 2008, Galloway spoke with Carbine. Galloway admitted that he went by the nickname "Bo." Galloway stated that he had been seeing Anderson since November 2008, and he said that he had sex with Anderson on Thanksgiving Day. Galloway admitted that he spoke with Anderson on December 5 and picked her up that evening in a white Ford Taurus.

Also, as part of the criminal investigation, Carbine obtained cell-phone records for Galloway from November 1, 2008, to December 21, 2008. The records indicated that Galloway and Anderson had been in contact beginning as early as November 11, 2008, and every day in December leading up to her disappearance and murder. They were in contact as many as fourteen times on Friday, December 5, 2008, the last time being 11:12 p.m.

Galloway was indicted and tried for the capital murder of Anderson. A

5

jury found him guilty of capital murder based upon sexual assault. During the penalty phase, the jury heard testimony from Galloway's friends and family members, who testified that he was a good father and that they would visit him if he was given life imprisonment. The jury also heard testimony from corrections officers explaining that Galloway had not caused any trouble during his prior incarceration. The State introduced a "pen pack" which included Galloway's prior conviction for carjacking and demonstrated that Galloway was under supervision of the Mississippi Department of Corrections (MDOC) when he murdered Anderson. Unpersuaded by Galloway's mitigating proof and finding four aggravating factors, the jury returned a sentence of death.

*Galloway*, 122 So. 3d at 625-27.

¶4.     On direct appeal, Galloway presented thirty assignments of error.  Finding no merit to the claims, the Court affirmed Galloway's conviction and sentence of death.  *Id.* at 682. Galloway then filed a petition for writ of certiorari in the United States Supreme Court, which was denied. *Galloway*, 572 U.S. 1134.

¶5.     Galloway filed a Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief (Capital PCR) on October 3, 2014.  On October 22, 2015, the Court granted a stay of the Capital PCR proceeding to allow Galloway to pursue a separate PCR matter related to his 2007 carjacking conviction in Jackson County, which was used as an aggravating factor during the sentencing phase of Galloway's capital murder trial.  The Court simultaneously granted a stay of the Capital PCR proceedings and remanded the case to the Circuit Court of the First Judicial District of Harrison County for resolution of various outstanding discovery matters, which were resolved as of June 26, 2017.

¶6.     On September 5, 2018, the Circuit Court of Jackson County denied Galloway's PCR

pertaining to his carjacking conviction. This Court affirmed on appeal, and rehearing was denied. *Galloway v. State*, 298 So. 3d 966 (Miss. 2020). With the Harrison County and Jackson County collateral matters concluded, the stay in this Capital PCR matter was lifted. Galloway was granted permission to file an amended Capital PCR, which is now before the Court, and all briefing has been completed.

## ANALYSIS

¶7. "Direct appeal [is] the principal means of reviewing all criminal convictions and sentences[.]" Miss. Code Ann. § 99-39-3(2) (Rev. 2020). "The Post-Conviction Collateral Relief Act provides a procedure limited in nature to review those matters which, in practical reality, could not or should not have been raised at trial or on direct appeal." *Wilcher v. State*, 863 So. 2d 776, 795 (Miss. 2003) (citing *Turner v. State*, 590 So. 2d 871, 874–75 (Miss. 1991). "This Court has recognized that post-conviction-relief actions have become part of the death-penalty appeal process." *Wilson v. State*, 81 So. 3d 1067, 1074 (Miss. 2012) (quoting *Chamberlin v. State*, 55 So. 3d 1046, 1049-50 (Miss. 2010)). Because Galloway's conviction and sentence have been affirmed on appeal, he must seek and obtain leave from this Court before seeking relief in the trial court. Miss. Code Ann. § 99-39-7 (Rev. 2020).

¶8. The Court's standard of review is well established. "Leave is granted only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they 'present a substantial showing of the denial of a state or federal right.'"

*Ronk v. State*, 267 So. 3d 1239, 1247 (Miss. 2019) (quoting Miss. Code Ann. § 99-37-27(5) (Rev. 2015)); *see also* Miss. Code. Ann. § 99-39-27(5) (Rev. 2020).

¶9.     Because this is a capital case, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Id.* (internal quotation marks omitted) (quoting *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016)). "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Flowers v. State*, 773 So. 2d 309, 317 (Miss. 2000) (internal quotation marks omitted) (quoting *Porter v. State*, 732 So. 2d 899, 902 (Miss. 1999)).

## I.     Ineffective Assistance of Counsel

¶10.    The test for claims of ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  In order to prevail on this claim, Galloway must demonstrate to this Court that his attorneys' performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (quoting *Strickland*, 466 U.S. at 687).

8

¶11.   This Court "strongly presume[s] that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy.  In other words, defense counsel is presumed competent." *Grayson v. State*, 118 So. 3d 118, 127 (Miss. 2013) (internal quotation marks omitted) (quoting *Chamberlin*, 55 So. 3d at 1050).  Even when professional error is shown, however, this Court must determine whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991) (internal quotation mark omitted).  When reviewing a case involving the death penalty, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  If Galloway's ineffective assistance of counsel claims fail on either of the *Strickland* prongs, his claims fail.  *Foster v. State*, 687 So. 2d 1124, 1129-30 (Miss. 1996).

¶12.   Galloway raises numerous claims of ineffective assistance of counsel.  Before addressing the substance of each claim, the Court must first determine if the claim is procedurally barred.  *Ronk*, 267 So. 3d at 1249.  Galloway's counsel on direct appeal differed from his counsel at trial.  In such instances, a defendant's failure to raise issues of ineffective assistance of counsel on direct appeal that are "based on facts fully apparent from the record" " shall constitute a waiver barring consideration of the issues in post-conviction

9

proceedings." Miss. R. App. P. 22(b). "The procedural bars of waiver, different theories, and res judicata as well as the exceptions thereto contained in Miss. Code Ann. § 99-39-21(1)-(5) are clearly applicable to death penalty post-conviction relief applications." *Moffett v. State*, 351 So. 3d 936, 942 (Miss. 2022) (internal quotation mark omitted) (quoting *Powers v. State*, 945 So. 2d 386, 395 (Miss. 2006)). "Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal." *Wilcher*, 863 So. 2d at 796 (quoting *Foster*, 687 So. 2d at 1129); Miss. Code Ann. § 99-39-21(1) (Rev. 2020). "We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Wilcher*, 863 So. 2d at 796 (quoting *Foster*, 687 So. 2d at 1129). It is Galloway's burden to demonstrate that his claims are not procedurally barred. *Moffett*, 351 So. 3d at 943; Miss. Code Ann. § 99-39-21(6) (Rev. 2020).

**A.** **Whether Galloway's counsel were ineffective in failing to conduct an adequate investigation and present available mitigating evidence during the penalty phase of trial.**

¶13. This issue is not procedurally barred.

**1. Failure to Tell Galloway's "True-Life Story"**

¶14. Galloway asserts that his trial counsel were ineffective in their investigation and presentation of mitigating evidence during the sentencing phase. He argues that the jury was deprived of consequential evidence pertaining to his: 1) difficult childhood history, 2) mental

10

illness, 3) desire for love and happiness and to be a good father, 4) parents' difficult upbringings, and 5) carjacking conviction used as an aggravating circumstance. It is Galloway's position that his attorneys failed to conduct a reasonable investigation, present all relevant and mitigating facts, and tell Galloway's "true-life story." But for these failings, Galloway contends that the jury would have sentenced him to life in prison rather than death.

¶15. With regard to claims of ineffective assistance of counsel based upon the alleged failure to investigate and/or effectively present mitigation evidence, this Court has stated:

> "[w]hile counsel is not required to exhaust every conceivable avenue of investigation," [**Ross v. State**, 954 So. 2d 968, 1005 (Miss. 2007)] (citing **State v. Tokman**, 564 So. 2d 1339, 1343 (Miss. 1990)), there is "a duty 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" **Id.** at 1005 (quoting **Strickland v. Washington**, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *see also* **Ronk**, 267 So. 3d at 1257 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (quoting [**Wiggins v. Smith**, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)] ). "The assessment . . . includes not only what counsel discovered, but also whether that evidence would have led a reasonable attorney to investigate further." **Ronk**, 267 So. 3d at 1257-58 (citing **Wiggins**, 539 U.S. at 527, 123 S. Ct. 2527).

**Evans v. State**, 294 So. 3d 1152, 1158 (Miss. 2020) (first and fourth alterations in original).

### a)      Childhood History

¶16. Galloway has provided affidavits from his family members, friends, and childhood girlfriends, all purporting to have first hand knowledge of Galloway's traumatic upbringing, which included poverty, trauma, family dysfunction, abandonment, neglect, domestic

11

violence, and the sexual abuse of his sister by their step-father. Some of the affiants discuss Galloway's ability to cope despite his childhood difficulties. Some of the affidavits report of Galloway's positive characteristics and the love he has for his children. The affiants all state that they were willing and able to testify on Galloway's behalf had defense counsel contacted them.

### b) Mental Illness

¶17. Galloway's alleged mental illness will be discussed in further detail below. Here, however, Galloway asserts that his counsels' failure to conduct an adequate mitigation investigation deprived the jury from hearing from family members about what they describe as violent and traumatic chaos in Galloway's childhood home, which they purport took a toll on his mental health.

¶18. In some of the affidavits, it was asserted that Galloway suffered from panic attacks and did not want to be alone. He was taken to the hospital at the age of eight for a panic attack after an altercation with his siblings. He was again taken to the hospital at age fourteen because his heart was beating heavy and fast, and he was shaking.

¶19. Others recall Galloway being sad and/or depressed and that it was hard for him to "manage his emotions." It was also expressed that Galloway, once upset, would turn red and that it took a long time for him to calm down. One of Galloway's childhood friends remembered a time when Galloway threatened to kill himself and locked himself in a room. Another friend recalled Galloway blacking out during a fight at the high school, not

12

remembering what had happened.   In a separate, similar incident, a friend of Galloway's remembers Galloway blacked out when he was attacked by multiple men, and he was confused when the police arrived, not knowing why he was being placed in the police car.

¶20.   Galloway is described as having isolated himself when something bothered him, staying inside his room day and night and refusing food.   Other times, he would drive, without a destination, until his car ran out of gas.  After Galloway's brother Marcus was sent to prison for murder, Galloway stayed in the house and would not do anything with his close friend.  His mother stated that Galloway spent a lot of time alone playing video games.  Some friends stated that they could tell something was wrong with Galloway in the days leading up to his arrest.

¶21.   Galloway is described as coping with his troubled environment by smoking marijuana on a daily basis when he was sixteen years old.  One affiant stated that Galloway passed out from the consumption of alcohol on his twenty-sixth birthday.  Galloway's mother, Ollie Varghese, stated that she found ten empty liquor bottles in Galloway's room following his arrest.   Galloway claims all of this was evidence of his mental distress and was easily obtainable.

### c) Resilience, Search for Love and Happiness, and Efforts to be a Good Father

¶22.   Galloway claims that his trial counsel failed to uncover and present evidence that he was resilient, that he was in search of love and happiness, and that he strived to be a good father.  Despite his purported violent environment, drugs, trauma, and poverty, Galloway,

13

again, offers affidavits to demonstrate that he had hobbies, played games with friends, fished, and participated in school athletics. He is described by the affiants as being talented at football, writing, and drawing.

¶23. Affidavits from Galloway's fourth and tenth grade teachers state that he was quiet, respectful, and never caused problems. His high school football coach stated in his affidavit that Galloway was hardworking, quiet, and never caused problems. Varghese stated that Galloway was her only child to graduate from high school. Some of the affiants described Galloway as fun-loving, wanting to make people laugh. Galloway's friends and family described him as hardworking and always looking for work. He is also said to be respectful of the adults in his life.

¶24. Through the affidavits, we are told that Galloway was protective of his family. One instance was when Galloway's mother was working at a convenience store when it was robbed. It is told that Galloway watched the surveillance tape, found out who the robber was, and fought the man for endangering his mother. Galloway also "got upset" with his sister's gym teacher for making her run during class when she was fifteen years old and eight months pregnant.

¶25. Galloway had "many girlfriends" over the years. One of his first girlfriends stated in her affidavit that the two were involved during junior high and high school. She stated that Galloway was a year ahead of her and that they became sexually active when she was in the eighth grade. She stated that Galloway never hurt her or asked her to do anything sexually

14

that made her uncomfortable. She described him as attentive, sensitive, and everything she wanted in a boyfriend. She further stated that they were in love, but her mother put a stop to the relationship when she "walked in on us" one night.

¶26. Another girlfriend of Galloway's stated in her affidavit that the two started dating when she was in the seventh grade and Galloway was in the ninth grade. She described him as caring and sensitive and said he liked to take care of people and protect them. She stated that Galloway got along well with everybody, and she was always comfortable having Galloway at her home with her family.

¶27. Galloway provided the affidavit of another girlfriend who stated that the two met in the spring of 2008. They worked together at a fast food restaurant. They dated for several months, including right up to the time of Galloway's December 9, 2008, arrest for Anderson's murder. That girlfriend stated that Galloway never hit or hurt her, and he never asked her to do anything sexually that she was not comfortable doing.

¶28. According to the affidavits, Galloway's one true love was the mother of his two oldest children, Shamekia Moore. Galloway has a third child with another woman. Galloway's relationship with Moore was described as a turbulent and trying on-and-off relationship. At the age of twenty-four, Galloway was convicted of carjacking. One affiant stated that Galloway's only focus was getting out of jail and returning to his children. One of the affiants stated that Galloway wanted to provide a home for Moore and his children and to have a stable family, while another affiant stated that Galloway's three children meant the

15

world to him and that Galloway did not want to repeat the same mistakes that his father had made, wanting to be a better father.

### d) Difficulties of Galloway's Parents' Upbringings

¶29. Galloway asserts that, beyond his own life, his trial counsel failed to uncover and present evidence related to his parents' backgrounds, which he asserts inherently affected they manner and environment in which they reared their children.

¶30. Galloway's mother, Varghese, stated in her affidavit that she learned the man she grew up thinking was her father, Otis Taylor, may not have actually been her father due to Galloway's maternal grandmother's alleged affair with a neighbor. Much of the information provided on this aspect of Galloway's petition also focuses on his maternal grandmother, Marie, who is purportedly full Choctaw and was born on indigenous land near Philadelphia, Mississippi.

¶31. According to affidavits, Marie grew up in extreme poverty. Before Varghese was born, Marie had four children, all by different fathers, at a young age. Marie left the reservation and joined the Army during World War II, leaving her children behind on the reservation. Marie began dating Taylor. While pregnant with Varghese, Marie temporarily left Taylor due to his alleged philandering, and she moved to Moss Point, Mississippi. It is stated that Marie had three children while married to Taylor, and Taylor may not have been the father of all of them. It is also stated that Varghese had a difficult time growing up, as the other children would call her and her sisters "half-breeds." Varghese grew up knowing

16

nothing of her other siblings back on the reservation until one of them attempted to reunite with Marie in Moss Point. Varghese did not meet her grandmother until she was twenty years old.

¶32.   Varghese stated in her affidavit that Taylor related to her, her sisters, and Marie through violence. She stated that Taylor was a jealous man and had a volatile temper. Just as Galloway's father would later do, Taylor beat Varghese. She also states that she witnessed Taylor raping her sister. Further, Varghese stated that she was raped by Taylor twice while Marie was in the hospital for a leg amputation. Varghese was later sexually assaulted as a teenager by her sister's male companion.

¶33.   Galloway's father, Leslie Galloway, Jr., known as "Red," also grew up in poverty. He struggled in school, being held back several times before he ultimately dropped out in the ninth grade. Red was described as being quiet as a child and as a young man, which the school saw as a "defect needing correction." It is stated that Red had a reputation for getting into fights. At age eighteen, Red beat a man over a woman. The second time they fought, the man was waiting for Red and shot him multiple times in the head and shoulders. According to affidavits, one of the bullets remained in Red's body near his spinal cord, leaving him physically disabled and causing periodic seizures.

### e)      Failure to Investigate Galloway's Carjacking Conviction

¶34.   As stated earlier, Galloway had been convicted of carjacking, a crime of violence, in Jackson County prior to committing the capital murder. Galloway pleaded guilty. That prior

17

conviction was used as an aggravating factor during sentencing. Galloway was also under the custody of the MDOC on supervised release when he murdered Anderson, which was an additional aggravating factor.

¶35. Galloway first asserts that his capital murder trial counsel were ineffective for failing to investigate his carjacking conviction, claiming that if they had done so, they could have timely filed a PCR in Jackson County to have the carjacking conviction overturned. As stated above, during the pendency of the instant matter, the Court allowed Galloway to file his carjacking-related PCR in Jackson County. The trial court found the PCR to be barred by time and, notwithstanding the time bar, *without merit*. *See **Galloway***, 298 So. 3d at 968. On appeal, this Court agreed in *both* regards. ***Id.*** We find Galloway's assertion that his trial attorneys could have fared better had they filed a PCR prior to expiration of the statute of limitation to be unfounded, since both the trial court and this Court found Galloway's claims to be meritless. Thus, Galloway can show no deficiency or prejudice.

¶36. Galloway also asserts that trial counsel should have investigated and presented the jury with the circumstances of his carjacking, claiming it would have decreased the weight of aggravation afforded that conviction by the jury. Galloway asserts that the carjacking record shows a favorable description of the facts, as provided by his attorney at the plea hearing in that matter, as follows:

> Mr. Galloway was -- just turned 18 when this carjacking happened. He was in high school. Basically, Your Honor, what happened is they had been drinking a little, they had gotten in the car with the girls. They had been riding around. The girls decided that they wanted them to get out. Mr. Galloway agreed to put

18

$5 worth of gas in the car. They drove around a little more, and they got into an argument. He pulled the girl out of the car and drove home, because he didn't want to walk. This is what the argument started over, about him getting out of the car and walking. He was very young.

Galloway also calls into question the veracity of the female complainant and her initial identification of the boys who took her car. Of note, while Galloway contends that circumstances surrounding his carjacking should have been used in mitigation to show that it was really a nonviolent offense, the prosecutor in that case explained at the plea hearing that Galloway forcefully dragged the female victim from the car, and she suffered bruises to her legs and a black eye. Carjacking is *per se* a crime of violence. *See **Galloway***, 122 So. 3d at 645. The hearing transcript also reveals that, when the judge asked Galloway to describe why he thought he was guilty, Galloway stated: "I had possession of a controlled substance in my pocket, and I took a car by force." The remainder of the circumstances as provided by Galloway's attorney included Galloway's experimentation with crack cocaine, as Galloway had also been charged with possession of drugs. Galloway asserts that because his trial counsel failed to investigate the circumstances of his carjacking conviction "and learn of these favorable facts, they could not determine whether to present them." Galloway concludes that his trial counsel were ineffective for failing to conduct a meaningful investigation, which he asserts would have led to the discovery of all of the above facts.

¶37. Galloway was represented by three attorneys at trial, Harrison County Public Defender Glen Rishel and two assistant public defenders, Charlie Stewart and Dana Christensen. All three attorneys agree that Attorney Rishel was responsible for mitigation and the penalty

19

phase of the trial. Attorney Rishel stated in his affidavit that his office employs an investigator, Damon Reese. Reese has a bachelor's degree in Criminal Justice and, if he were to complete his thesis, he would receive his master's degree in Sociology. Reese is said to have attended the same capital case seminars as Attorney Rishel, and he has many years of experience in law enforcement with the Harrison County Sheriff's Office.

¶38. Defense Counsel retained psychologist Dr. Beverly Smallwood, and she evaluated Galloway. Attorney Rishel states that defense counsel provided Dr. Smallwood with everything she requested and what was in their possession. He attests that he is unaware of any information that Dr. Smallwood needed that she did not have in order to make her evaluation pursuant to the *M'Naghten* test. *See M'Naghten's Case* (1843) 8 Eng. Rep. 718, 10 Clark and F. 200. The *M'Naghten* test is used to determine whether the accused knew right from wrong at the time the act was committed. *Woodham v. State*, 779 So. 2d 158, 163 (Miss. 2001). In Dr. Smallwood's report of Galloway's evaluation, she stated:

> Leslie maintained good eye contact which was appropriate to the interview. His motor behavior was normal. His speech was clear, concise, and comprehensible. His voice tone was relatively soft.
>
> Leslie's thought processes were normal and coherent, with no evidence of flight of ideas, circumstantialities, or loose associations. There was no evidence of delusional thought content. He denied particular fears or phobias except the fear of heights. He says that he has had periods of low self-esteem and self-reproach. He denies feeling that others are out to get him. He denies suicidal thoughts. However, he said that every now and then in the past he would think of suicide, like if he were driving and wondered what it would be like to run off the road. He denies any chronic feelings of resentment.
>
> With respect to somatic functions and concern, Leslie said that his appetite is

20

good. He does not sleep well. He tosses and turns and has trouble going to sleep. His energy level is "so so." He has no history of seizures. He does not appear to be particularly preoccupied with his physical health.

Leslie's orientation was assessed. When he was asked the date of today, he said correctly that it is the seventh of November, 2009. He knew that he was in the Harrison County Adult Detention Center. When asked the name of the examiner, he did not know her name. He thought that the examiner "evaluates people through the mind."

There was no evidence of clouded consciousness or dissociation. He said that he has "a little" memory problems. He said, "I can remember long ago, but sometimes not last week." He reads, but sometimes has trouble concentrating.

When asked about any past traumas in his life, Leslie talked about when his brother "caught his charge" in '97 or '98. He denies any abuse or trauma in his childhood. He said that his mother loved him and tried to raise him right. "She tried to keep me away from wrong activities. If there was something I needed or wanted, she'd try to get it for me," he explained.

Leslie denied any significant problems with depression in his past. He said that sometimes he gets depressed when his "baby mama" gets mad at him and says he can't see his kids. He says he is depressed now "in ways, yeah." He tearfully stated, "I think of my family out there and being away. I really miss my children." He has both gained and lost weight. He has sleep disturbance. There is no evidence of psychomotor retardation. He is no more tired than usual. He denies current feelings of worthlessness. He denies current suicidal ideation or intent.

There is no evidence of periods of mania. There are no signs of obsessive-compulsive disorder. Leslie denies any significant anxiety.

When asked about hearing things others didn't hear (auditory hallucinations), he said that he has heard people calling his name when he was out in the free world. He has never seen things that others didn't see (visual hallucinations). No delusional thought content is present. There is no evidence of disordered thought or speech. His affect is normal.

When he was "outside," Leslie was doing marijuana before he got convicted on the first charge. Since released in February, he claims he does no drugs at

all.

Leslie says, "I like to drink, but I don't get drunk." When asked about how much he might drink on a given occasion, he said that he might drink about three drinks, because, "at the club they are high (expensive.)" He says he drank mostly liquor on weekends or "whenever I could afford it." He denied that alcohol has even gotten him in trouble. He denies any family history of alcoholism.

¶39. With regard to Galloway's mental state at the time of the offense, Dr. Smallwood concluded that "[t]here is no indication that Leslie was experiencing any mental problems that would have rendered him unable to distinguish between right and wrong. He was functioning normally during this period of time." Dr. Smallwood conducted the Wechsler Adult Intelligence Scale-IV (WAIS-IV), to determine Leslie's overall intellectual functioning, as well as his ability to perform specific types of tasks. Galloway's composite score (Full Scale IQ) was 106, with 90 - 109 being "Average" range.

¶40. Dr. Smallwood stated her forensic opinion as follows:

It is my opinion, to a reasonable degree of psychological certainty, that Leslie Galloway:

A) did not have a mental disorder at the time of the alleged crimes which prevented him from knowing right from wrong;

B) is competent to assist counsel in his defense,

C) is not impaired intellectually; his scores and performance are not indicative of mental retardation.

It was Dr. Smallwood's opinion that "[n]o further forensic evaluation is needed to determine competency or legal sanity at the time of the alleged crimes." She did state that conducting

a full mitigation study was outside the scope of her forensic practice, and she recommended that a qualified forensic psychiatrist conduct a mitigation study or that the defense enlist the mitigation services of the Office of Capital Defense.

¶41.    Attorney Rishel stated in his affidavit that he was advised by Dr. Smallwood that putting her on the witness stand during the penalty phase would not help Galloway. And although Attorney Rishel told the jury during opening statements of the sentencing phase that they would hear from Dr. Smallwood, she ultimately was not called as a witness.

¶42.    Also in his affidavit, Attorney Rishel stated that the defense team would usually meet with Galloway at the jail or at the courthouse. He stated that Galloway usually sat with his head down and was quiet. Between Attorney Rishel and Reese, they met with Galloway's mother seven or eight times. They also talked to other members of Galloway's family and called several of them as witnesses in mitigation. Attorney Rishel stated that they wanted as many witnesses as they could find to testify that Galloway would have visitors if he went to prison and that he would be a good prisoner.

¶43.    From the interviews, defense counsel learned that Galloway's family loved him, that they would visit Galloway in prison, and that Galloway could still have a positive impact on his family and on his children. Defense counsel learned that Galloway was a quiet person who spent most of his time playing video games and that he had a couple of friends. Attorney Rishel stated in his affidavit that the defense learned of Galloway's brother being in prison for murder and that "We did not want the jury to know this."

23

¶44. Attorney Rishel added:

[t]hat the only records that we knew of were school records from Greene County. We obtained copies of these records and would have obtained any other records if we had known of their existence. I do not recall being told about any other records regarding Mr. Galloway. We relied on Mr. Galloway and his family to give us a history of Mr. Galloway's life. Based on what we were told, there were no other records.

That from our investigation, we determined there was nothing in Mr. Galloway's history that would shock the conscience of the jury in terms of mitigation. There was no indication that he suffered from any kind of disability or mental health problems. Mr. Galloway had average or above average intellectual functioning and no psychosis. Mr. Galloway nor any one in his family ever told us about any domestic violence issues.

¶45. Attorney Rishel stated that the defense team was led to believe by Galloway and his mother that Galloway had no remarkable history of any kind, and when he spoke with Galloway about a possible plea, Galloway said, "I just don't feel like I did it" as opposed to "I didn't do it."

¶46. Finally, Attorney Rishel stated that he was aware that Galloway had a carjacking conviction and two drug convictions. He was also aware that Galloway was indicted on February 6, 2009, for two counts of sexual battery and one count of burglary. Those charges were pending at the time of Galloway's capital murder trial.

¶47. In mitigation during the sentencing phase, the defense called Deborah Whittle, the officer in charge of the Offender Services Department at the Harrison County Adult Detention Center. She testified that she had known Galloway for approximately two years and "reviewed" him approximately every thirty days. She described Galloway as "very

24

quiet" and "never … disrespectful in anyway." Deputy Whittle testified that Galloway had only one rule violation for being in an unauthorized area talking to another inmate, which she agreed was "very minor."

¶48. Next, the defense called Dawn Denise Catchings, a corrections officer at the Harrison County Adult Detention Center. Catchings testified that she interacted with Galloway every day for a year while at the detention center and that Galloway never lost his temper with her and never got in trouble.

¶49. Galloway's sister, Jeles Galloway, was thirteen years old at the time of trial. Jeles testified that she loved Galloway and that it would be good for her to go visit him in prison as often as she could.

¶50. Vincent Bishop, Galloway's brother-in-law, testified that Galloway has three children and is "an excellent father." Bishop testified that he visits Galloway once every three to four months and would continue to do so if Galloway were sentenced to life without parole.

¶51. Angelo Ash, Galloway's friend since grade school, testified that he and Galloway were like brothers. Ash testified that Galloway loves his children and treats them with respect and kindness. Ash testified that he would go visit Galloway in prison.

¶52. Red testified that he loves his son and wants to see Galloway stay alive. Red also testified that it was important to him to be able to visit Galloway in prison. He added that Galloway's children love their father, and they have good relationships with Galloway.

¶53. Next, Mary Taylor, Galloway's older sister by one year, testified that she is close to

Galloway and they love one another. She testified that they were close while growing up. Taylor told the jury that Galloway helps her with her four children and kept them at times. She also testified that she and her children had been visiting Galloway while he was in prison prior to trial and would continue to do so. She agreed that Galloway had something to contribute to the family and wanted him to live.

¶54. Finally, the defense called Varghese, who testified that she loves her son, and that he has been kind, generous, and polite. She testified to Galloway's being a good father and the mutual love that he and his children share. Varghese testified that she wanted the jury to let her son live and that she would visit him in prison as often as she could.

¶55. While Galloway argues that his attorneys were ineffective for failing to investigate and present evidence of his "life story," the State maintains Galloway cannot prove that trial counsel's mitigation investigation or presentation of mitigation evidence was objectively deficient and unreasonable. Galloway's burden is considerable.

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Stringer* at 477; *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. In short,

26

defense counsel is presumed competent. ***Johnson v. State***, 476 So. 2d 1195, 1204 (Miss. 1985); ***Washington v. State***, 620 So. 2d 966 (Miss. 1993).

***Foster***, 687 So. 2d at 1130 (alteration in original). "Surmounting ***Strickland***'s high bar is never an easy task." ***Harrington v. Richter***, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (internal quotation marks omitted) (quoting ***Padilla v. Kentucky***, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)).

> "Prevailing norms of practice as reflected in American Bar Association [(ABA)] standards and the like . . . are guides to determining what is reasonable." ***Strickland***, 466 U.S. at 688, 104 S. Ct. 2052. But those standards are only guides. ***Bobby v. Van Hook***, 558 U.S. 4, 8, 130 S. Ct. 13, 17, 175 L. Ed. 2d 255 (2009) (quoting ***Strickland***, 466 U.S. at 688, 104 S. Ct. 2052) (" '[ABA] standards and the like' are 'only guides' to what reasonableness means, not its definition."). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." ***Strickland***, 466 U.S. at 688-89, 104 S. Ct. 2052.

***Ronk***, 267 So. 3d at 1248 (alterations in original).

¶56. The State's position on this issue is that defense counsel was aware of Galloway's history of criminal convictions and pending criminal charges, as well as the fact that Galloway's brother was serving a life sentence for murder. The State maintains that defense counsels' decision to "humanize" Galloway was strategic. This Court has recognized that the decision to humanize a defendant is reasonable. ***Walker v. State***, 303 So. 3d 720, 728 (Miss. 2020).

¶57. In ***Walker***, which presented a similar scenario, Randy Dale Walker was convicted of capital murder during the commission of sexual battery, and he was sentenced to death. ***Id.***

27

at 723. The Court remanded the case to the trial court for a hearing on Walker's claim that trial counsel had rendered ineffective assistance in searching for and presenting mitigating evidence during the penalty phase. *Id.* "The crux of Walker's argument concerning [his attorney's] alleged deficient performance and its relation to the testimony of his mitigation witnesses is that had [his attorney] asked them to testify at trial, they could have told the jury that Walker had a less than ideal childhood." *Id.* at 727. The circuit court found that Walker's trial counsel's strategy of seeking to humanize Walker before the jury had been reasonable. *Id.* at 725. On appeal, this Court affirmed and noted that in an effort to humanize Walker, his attorney "called witnesses in mitigation to testify, among other things, that Walker had a supportive family, loved his daughter, and risked his own life to save the life of a child." *Id.* at 727. Walker's attorney testified at the post-conviction hearing that he would not have wanted evidence of bad and criminal conduct to be introduced as Walker's post-conviction attorneys may have wanted to introduce. *Id.* On rehearing to this Court, Walker argued that the Court "misapprehended *Strickland*'s standard that counsel's strategic decision must be based on an adequate investigation." *Id.* at 728. This Court found that Walker's counsel did not "disregard[] . . . multiple red flags." *Id.* (internal quotation marks omitted) (quoting *Andrus v. Texas*, 140 S. Ct. 1875, 207 L. Ed. 2d 335 (2020)). "Rather, he made very clear that he pursued a tactical decision to humanize Walker." *Id.*

¶58. The Supreme Court has explained:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic

28

choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Wiggins*, 539 U.S. at 521-22 (alteration in original) (emphasis added) (quoting *Strickland*, 466 U.S. at 690-91).

¶59.    In today's case, Galloway had not only a prior conviction for carjacking, of which the jury was aware, he had two drug-related convictions stemming from the carjacking. Further, Galloway was indicted on February 9, 2009, for burglary and two counts of sexual battery, and he was awaiting trial on those charges during his capital murder trial. Galloway's defense counsel was fully aware that Galloway's brother was serving a life sentence for murder. Attorney Rishel stated in his affidavit that "[w]e did not want the jury to know this." As the State points out, "[W]hen the defendant puts mitigating evidence before the jury during the penalty phase, the prosecution is allowed a counter-attack." *Corrothers v. State*, 255 So. 3d 99, 109 (Miss. 2017) (alteration in original) (internal quotation marks omitted) (quoting *Finley v. State*, 725 So. 2d 226, 239 (Miss. 1998)). The State argues that Galloway's defense team was forced to consider "each potential landmine" while planning their trial and mitigation strategy. "Mitigation evidence can be double-edged – so much so that counsel, following a constitutionally adequate investigation, may reasonably choose to offer none." *Ronk*, 267 So. 3d at 1274 (citing *Burger v. Kemp*, 483 U.S. 776, 788-95, 107

29

S. Ct. 3114, 97 L. Ed. 2d 638 (1987)). Galloway's attorneys made a strategic choice to humanize Galloway rather than risk harmful evidence being presented to the jury on cross-examination of mitigation witnesses. "Defense counsel is not required to pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Garza v. Stephens*. 738 F.3d 669, 680 (5th Cir. 2013) (citing **Harrington**, 562 U.S. at 108). "[C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.*" **Strickland**, 466 U.S. at 691 (emphasis added).

¶60. Further, some of the affidavits presented by Galloway in support of his ineffective assistance of counsel argument were from witnesses who were interviewed by his defense counsel and were called to testify during the sentencing phase. Attorney Rishel stated in his affidavit that the defense team "relied on Mr. Galloway and his family to give us a history of Mr. Galloway's life." When meeting with Galloway, "Mr. Galloway usually sat with his head down and was quiet." And despite the seven or eight times they met with Varghese, they "were [led] to believe by Mr. Galloway and his mother that Mr. Galloway had no remarkable history of any kind."

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated

30

altogether.

*Strickland*, 466 U.S. at 691.

¶61. We find that Galloway has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. "If a post-conviction claim fails on either of the *Strickland* prongs, the inquiry ends. *Foster*, 687 So. 2d at 1130 (citing *Neal v. State*, 525 So. 2d 1279, 1281 (Miss. 1987))." *Williams v. State*, 722 So. 2d 447, 451 (Miss. 1998).

### 2.  Prejudice

¶62. Assuming, *arguendo*, that counsel's investigation and presentation of mitigation evidence was deficient, Galloway cannot show prejudice.  Prejudice is evaluated by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  "[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker, *Strickland*, 466 U.S., at 700, 104 S. Ct. 2052." *Sears v. Upton*, 561 U.S. 945, 954, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010). "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).  "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citing *Strickland*, 466 U.S. at 693).

¶63. To the extent the new evidence Galloway provides may have benefitted him, it was also damaging.  Pointing to just a few instances, while Galloway sought to express how

31

protective he was of his family, Galloway tracked down and beat the man that robbed the store where his mother worked. While Galloway may see this as being protective of his family, it could have also portrayed Galloway as a vigilante, engaging in violence to exact revenge. While trying to explain the circumstances surrounding the carjacking conviction as nonviolent, or less violent than the jury may have perceived, it would have opened the door to the fact that the victim was dragged from the car and suffered bruises and a black eye. In Galloway's own words, "I took the car by force because I didn't want to walk home."

¶64. While Galloway's new evidence would show that he loves his children, it is cumulative to what the jury heard. Telling Galloway's "life story" and sharing his difficult childhood dealing with violence, extreme poverty, as well as all of his life experiences are certainly mitigating circumstances. They may well have exposed, however, his prior felony drug convictions and the pending burglary and sexual assault charges. It also would have exposed to the jury that Galloway's brother was serving a life sentence for murder, which Attorney Rishel specifically did not want the jury to hear.

¶65. Further, Galloway's affidavits from childhood girlfriends, who purportedly would have testified that Galloway was sensitive and everything that a girl could want in a boyfriend, is starkly contrasted by the circumstances surrounding the capital murder conviction. While those past girlfriends stated that Galloway never asked them to do anything sexually that made them uncomfortable, Galloway was found by the jury to have anally raped seventeen-year-old Anderson, cut her throat, and burned her before ultimately

32

ending her life by repeatedly running her over with an automobile.

¶66. The jury in this case found each of the following aggravating circumstances, unanimously, beyond a reasonable doubt:

1. The capital offense was committed while Galloway was under sentence of imprisonment.

2. The defendant was previously convicted of a felony involving the use of threat of violence to another person.

3. The capital offense was committed when the defendant was engaged in the commission of committing sexual battery.

4. The capital offense was especially heinous atrocious or cruel.

Again, assuming only for the sake of argument that Galloway's counsel were deficient in their investigation of mitigating evidence, reweighing the aggravating evidence against the totality of the new mitigating evidence Galloway now presents is not reasonably likely to reach a different result. This issue is without merit.

### 3. Investigation and Presentation of Galloway's Mental Health Mitigation by Available Experts

¶67. Galloway contends that his trial attorneys were ineffective for failing to investigate, retain experts, and present available expert testimony about Galloway's mental health. Galloway asserts experts Dr. Frederic Sautter and Dr. Beverly Smallwood would have testified that he suffers from Post-Traumatic Stress Disorder (PTSD) and complex PTSD, consistent with his documented extensive trauma history. He maintains that they would have explained that Galloway has other serious mental illnesses, including Depressive Disorder

33

and Psychotic Disorder. Further, Galloway demonstrates through affidavits abnormalities indicating mild traumatic brain injury.

¶68. To be sure, as was discussed above, Galloway's defense counsel did contact Dr. Smallwood in an attempt to evaluate Galloway's mental health. Without repeating all of her findings here, it is important to add that Dr. Smallwood stated in her report to defense counsel that Galloway denied any significant medical history, other than a work-related hand burn that required outpatient therapy. Further, Dr. Smallwood reported that "[Galloway] denies any abuse or trauma in his childhood. He said that his mother loved him and tried to raise him right. 'She tried to keep me away from wrong activities. If there was something I needed or wanted, she'd try to get it for me,' he explained." In that report, Dr. Smallwood also stated that Galloway was taking no medications and had "never received treatment for any mental health issues." Further, "[t]here was no evidence of clouded consciousness or dissociation." She stated that "[Galloway] denied any significant problems with depression in his past" and that "[t]here is no evidence of periods of mania." Dr. Smallwood concluded that "[a]dditionally, he does not have mental retardation. *No further forensic evaluation is needed to determine competency or legal sanity at the time of the alleged crimes.*" (Emphasis added.)

¶69. Now, having been provided by PCR counsel with the affidavits and records describing Galloway's childhood and social history, Dr. Smallwood has changed her position. She stated in her affidavit that she is now aware that Galloway had severe symptoms of

34

depression before and leading up to his arrest, symptoms she previously had attributed to his situational circumstances, such as the difficulties he had been experiencing with the mother of his children. Further, she stated that she would have testified that Galloway "met the criteria for Major Depressive Disorder, a serious psychological disorder that involves disturbances in mood that can result in significant withdrawal, that can be expressed as severe irritability, and that can affect cognitive function. Dr. Smallwood attests that, had she been provided Galloway's medical records from the Harrison County Adult Detention Center, she could have corroborated Galloway's reported trouble with sleeping, and it would have contributed to a diagnosis of PTSD and Major Depressive Disorder. She also stated that Galloway's underreporting of his trauma history and early life adversity is symptomatic of PTSD. Dr. Smallwood admits that when she evaluated Galloway, she did not see a need for neuropsychological testing, but having learned that such testing had since been performed by Dale Watson, Ph.D., a licensed psychologist, which indicated that Galloway has significant attention deficits and that his pattern on the neuropsychological testing was most similar to that of people with mild Traumatic Brain Injury (mTBI), she stated such testing would have been appropriate and should have been employed. Dr. Smallwood concluded her affidavit with the following comments:

> Had I been provided with the details of [Galloway's] social history to which I am now privileged, my evaluation and conclusions would have been very different, and I would have had mitigating information to share to the jury at the penalty phase. I would have been able to testify to the negative psychological impacts of Leslie's extensive trauma history, the poverty, abuse, and neglect that marked his childhood, and the history of mental illness,

35

substance abuse, and sexual abuse in his family. My testimony could have been woven into his penalty phase mitigation case in an effective manner.

I did the best I could with what was available to me at the time of [Galloway's] trial, but am disappointed that I had only a fraction of this powerful and compelling story with which to work.

¶70.    In further support of his argument, Galloway provides the affidavit of Frederic J. Sautter, Ph.D., a licensed clinical psychologist specializing in psychotic disorders and PTSD. In preparation for Galloway's post-conviction motion, Dr. Sautter performed psychological evaluations of Galloway.  An important aspect of his assessment of Galloway focused on identifying psychological problems through the administration of psychological assessment instruments.  Dr. Sautter determined that Galloway had been exposed to "traumatic events." Dr. Sautter states that much of the information from the Life Events Interview was corroborated by social history documents, including affidavits of family members and friends as discussed above, as well as medical and court records, and they indicated that Galloway had significant exposure to  traumatic events such as:

> (1) domestic violence perpetrated by Mr. Galloway's father against his mother, and later against his father's girlfriend; (2) physical violence against Mr. Galloway by his father, including being beaten with a belt at a very young age; (3) witnessing physical violence by his father against his brother Melvin and sister Mary; (4) physical violence against Mr. Galloway by his maternal grandfather, including one incident in which Mr. Galloway had to go to the Emergency Department in fear that his grandfather had broken his arm; (5) additional fights that led to other visits to the Emergency Department, at 12, 15, 17, and 23 years old; and (6) Melvin's threats to kill himself, which were especially traumatic to Mr. Galloway because he looked up to his older brother.

Dr. Sautter also stated that an assessment of Galloway's early life adversity indicates that

36

"Galloway was exposed to sufficient adversity as to increase his vulnerability to psychological problems as an adult." Dr. Sautter concluded:

> It is my opinion to a high degree of clinical certainty that at the time of the offense Mr. Leslie Galloway's thinking and behavior were strongly influenced by his PTSD, complex posttraumatic stress, depression, and psychosis. It is also my opinion that the influence of complex trauma processes would decrease his ability to exercise conscious control over his own behavior and increase his perceptions of threat while rendering him less capable of controlling his trauma-related emotions and anger.

¶71. Prior to reaching his conclusion, Dr. Sautter stated that it was important to ensure that an expert in neuropsychology administer neuropsychological testing of Galloway, which was performed by Dr. Watson. Dr. Watson also completed the Wechsler Adult Intelligence Scale - IV (WAIS IV) to determine Galloway's intellectual functioning, which was placed at an overall level of 101, which was within the Average range.[1] Galloway's Full Scale IQ, a measure of general intellectual ability, was 101. Dr. Sautter states that the results indicated that Galloway does not show evidence of memory problems, thus his memory failure is most likely the result of dissociative processes.

¶72. Bhushan S. Agharkar, M.D., stated in his affidavit that Galloway reported "severe sleep disturbances" and that he "exhibited slow processing speed whenever he had to call something from memory, indicating impaired verbal recall and fluency." Dr. Agharkar opined that "[t]hese symptoms could indicate that Mr. Galloway suffers from serious mental

---

[1] Dr. Watson stated he found multiple errors in Dr. Smallwood's scoring of Galloway's Full Scale IQ, which was found to be 106 – still within the Average range.

health problems, including brain damage."

¶73.   Post-conviction expert, Ruben Gur, Ph.D., states in his affidavit that he analyzed the results of the neuropsychological testing by Dr. Watson and completed a behavioral imagining analysis, a method he developed that utilizes a computer algorithm to conduct an interpretation of standardized neuropsychological test results.  Dr. Gur found the results of the test suggested "left hemisphere dysfunction" and recommended an MRI and PET scan to "assess the structural and functional bases for brain abnormalities."  Further, Dr. Gur found abnormalities that "implicate brain systems that are important for regulating behavior" and noted that "individuals with such abnormalities are not capable of using normative means for regulating behavior."  Dr. Gur determined that "the abnormalities observed are consistent with several causes, including traumatic brain injury."

¶74.   Galloway maintains that his counsels' failure to provide Dr. Smallwood with sufficient information to conduct a comprehensive analysis stemmed from their failure to conduct an adequate mitigation investigation or retain a qualified mitigation investigator to do it for them.

¶75.   Again, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 528 (internal quotation mark omitted) (quoting *Strickland*, 466 U.S. at 690-91).  As with Galloway's other arguments, this argument turns on the proposition of an alternative strategy.  In reaching his conclusion that defense counsel

was ineffective, Galloway asserts that counsel should have presented Dr. Smallwood with a complete history of his life. As discussed above, defense counsel's decision to humanize Galloway in mitigation rather than delve into his "life story" and present mitigating evidence that would potentially expose damaging evidence the defense knew it did not want the jury to hear, was reasonable and strategic performance, not deficient performance. "The fact that an attorney's strategic choices did not result in a good outcome is not in and of itself definitive evidence of ineffective assistance of counsel. 'The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003) (collecting cases)." *Turner v. State*, 953 So. 2d 1063, 1073 (Miss. 2007).

¶76. In *Ronk*, defense counsel moved, pretrial, for the trial court's authorization to hire Dr. Smallwood to conduct a psychiatric/psychological evaluation of Timothy Robert Ronk. 267 So. 3d at 1261. Pursuant to the trial court's order, as in this case, Dr. Smallwood was retained, in part, "to prepare a mitigation study." *Id.* (internal quotation marks omitted) An important difference between Dr. Smallwood's evaluations of Ronk and Galloway is that, in Ronk's evaluation, she concluded as follows:

> It is my opinion, to a reasonable degree of psychological certainty, that:
>
> > a)  . . . Ronk knew right from wrong at the time of the alleged crimes;
> >
> > b)  [Ronk] is competent to assist counsel in his defense;
> >
> > c)  the level of intelligence of [Ronk] is in the High Average range,

with a Full Scale IQ of 114.

> In addition to the above findings, it must be noted that *many variables which may provide mitigation are reportedly found in this man's psychological and medical history. However, I do not have the benefit of those medical records.* It is highly recommended that these and other relevant records be secured and that collateral witnesses be interviewed. The present examination is not a mitigation study, which is outside the scope of my current practice.
>
> . . .
>
> With respect to the above questions posed by the [c]ourt and addressed in the previous section, no further evaluation is needed.

*Id.* at 1265 (alterations in original) (emphasis added). Dr. Smallwood had discovered and testified that, in addition to bipolar disorder and ADHD, Ronk appeared to have a "conduct disorder" in his childhood. *Id.* at 1262 (internal quotation marks omitted). This Court held that:

> Dr. Smallwood's report and the records that were obtained arguably would have led a reasonable attorney to investigate further. *Her report clearly signaled that more was needed.* She said "many variables which may provide mitigation are reportedly found in [Ronk's] psychological and medical history. However, I do not have the benefit of those medical records."

*Id.* at 1272 (alteration in original) (emphasis added).

¶77.    As for Galloway's evaluation, there was nothing in Dr. Smallwood's report that signals an incomplete medical diagnosis, as did Ronk's. In *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (alteration in original) (footnote omitted), the United States Court of Appeals for the Fifth Circuit stated:

> The record makes clear that Segundo's trial counsel obtained the services of a mitigation specialist, fact investigator, and two mental-health experts. These

experts and specialists conducted multiple interviews with Segundo and his family, performed psychological evaluations, and reviewed medical records. Segundo claims that trial counsel failed to provide necessary social history, which would have changed the experts' conclusions that he is not intellectually disabled. But none of the experts retained by trial counsel indicated that they were missing information needed to form an accurate conclusion that Segundo is not intellectually disabled. "Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004); *see Turner v. Epps*, 412 Fed. Appx. 696, 704 (5th Cir. 2011) ("While counsel cannot completely abdicate a responsibility to conduct a pre-trial investigation simply by hiring an expert, counsel should be able to rely on that expert to alert counsel to additional needed information . . . .").

Attorney Rishel attests that he provided Dr. Smallwood with everything she requested from the defense team. Dr. Smallwood also advised that "putting her on the witness stand during the penalty phase would not help Mr. Galloway." Because counsel were not deficient for failing to further develop Galloway's childhood and social history in mitigation after tactically deciding to humanize Galloway instead, they should not be found to have performed deficiently here when the argument hinges on the same potential evidence counsel chose to forgo.

¶78.    Galloway also argues that his attorneys should have taken Dr. Smallwood's advice and hired a mitigation expert, which defense counsel did not do. This Court has held:

[W]e disagree that the *requirement* of a mitigation specialist is well settled. That is untrue. *Hill v. Mitchell*, 842 F.3d 910, 945 n.15 (6th Cir. 2016) (stating ABA Guidelines do not establish a constitutional right to a mitigation specialist for the sentencing phase); *Honie v. State*, 342 P. 3d 182, 194 (Utah

41

2014) ("[T]rial counsel is not required to hire a mitigation specialist in order to comply with his Sixth Amendment obligations."); *State v. McGuire*, 80 Ohio St. 3d 390, 686 N. E. 2d 1112, 1120 (1997) (holding that hiring a mitigation specialist is not a requirement for effective assistance). There is no "per se rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained." *Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006).

*Ronk*, 267 So. 3d 1272 (Miss. 2019) (alterations in original).  Galloway has failed to show that counsel were deficient for failing to hire a mitigation specialist as recommended by Dr. Smallwood.  As the State points out, it is up to Galloway's attorneys to decide how to defend his case, not Dr. Smallwood.  Again, Dr. Smallwood did not signal to defense counsel that further medical diagnosis was necessary, and the strategic decision to humanize Galloway in mitigation had been made.  Reese was the fact investigator on the defense team.  Attorney Rishel stated in his affidavit that:

> Mr. Reese and I worked on the mitigation. Mr. Reese has a Bachelor's Degree in Criminal Justice and if he were to complete his thesis, he would receive his Master's Degree in Sociology. He has attended the same capital case seminars as me and has many years of experience in law enforcement with the Harrison County Sheriff's Office.

Attorney Rishel has exhibited his confidence in Reese, and the decision not to hire a mitigation specialist was a tactical decision.  Galloway's argument is without merit.

¶79.    Finally, Galloway claims that Attorney Rishel provided ineffective assistance of counsel when he announced to the jury during opening statement in the penalty phase that Dr. Smallwood would testify and, ultimately, he did not call her as a witness. No reason is given for why Dr. Smallwood was not called.  Attorney Stewart stated in his affidavit that

42

he primarily worked on the guilt phase of Galloway's trial. Attorney Stewart "recall[s] Mr. Rishel had subpoenaed Dr. Smallwood and a number of family members for the sentencing phase." He further stated: "I don't know why Mr. Rishel said that he was going to call [Dr. Smallwood] to testify in his opening statement at the penalty phase, but then didn't call her, *except that she was going to say something hurtful*. We decided not to call her." (Emphasis added.)

¶80.    The trial court's order approving the hiring of Dr. Smallwood stated that "the defendant shall not be required to disclose any of the results of the said evaluations unless he chooses to raise an issue regarding such psychological evaluation at the trial of this matter or at the sentencing phase." In her evaluation of Galloway, Dr. Smallwood stated that "[w]hen asked about any past trauma in his life, [Galloway] talked about when his brother 'caught his charge' in '97 or '98." Perhaps Attorney Rishel was going to call Dr. Smallwood as backup in the event he felt the planned strategy of humanizing Galloway failed. Regardless, Attorney Stewart's affidavit establishes that it was a strategic decision to not call Dr. Smallwood in the end. Counsel is presumed competent. *Foster*, 687 So. 2d at 1130. Galloway has failed to overcome that presumption, and his argument here is without merit.

B.      **Whether trial counsel provided ineffective assistance during jury selection.**

1.      **Failure to Raise any *Batson* Challenge**

¶81.    In ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Supreme Court of the United States held that, when exercising peremptory challenges against

43

prospective jurors in a criminal trial, a State may not discriminate on the basis of race.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2234, 2014 L. Ed. 2d 638 (2019). Galloway

contends that his defense counsel were ineffective for failing to object and otherwise levy

a challenge against the prosecution's use of three out of four of its peremptory strikes against

black potential jurors, resulting in Galloway, a black man, being convicted by an all-white

jury.

¶82.    This issue was capable of being raised on direct appeal.

> Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

Miss. Code Ann. § 99-39-21(1) (Rev. 2020). We agree with the State that this ineffective

assistance of counsel claim was capable of being raised on direct appeal, as it is a record-

based challenge. In fact, on direct appeal, Galloway alleged his trial counsel were ineffective

for failing to challenge two potential jurors for cause. *Galloway*, 122 So. 3d at 672. The

Court found both claims to be without merit. "Moreover, 'a party who fails to object to the

jury's composition before it is empaneled waives any right to complain thereafter.'" *Keller*

*v. State*, 138 So. 3d 817, 842 (Miss. 2014) (internal quotation marks omitted) (quoting

*Duplntis v. State*, 644 So. 2d 1235, 1245 (Miss. 1994)). Notwithstanding the procedural bar,

this claim is also without merit.

¶83.    Galloway asserts that the State used two of three peremptory strikes to remove two

44

black females from the jury. In the first round of names presented to the State to produce twelve jurors, the State utilized only one peremptory strike, removing a black female, Annie Marie Taylor. What Galloway does not mention is that the State accepted a black male, Willie C. Sims, to be the twelfth juror. As the selection process continued, the State utilized two more peremptory strikes, removing a black female and a white male. It was the defense, using its third peremptory strike, that removed Sims, resulting in an all-white jury.

¶84. Next, alternates were selected. The trial court allowed the prosecution and the defense one peremptory strike each in the selection of alternates. The State used its one peremptory strike to remove a black male. The next juror, a white female, was accepted by the defense. The defense then exercised its one peremptory strike to remove the next juror, a white female. The trial court was left to select the next alternate in line, a black female. Neither of the alternates ultimately served.

¶85. In support of his claim that defense counsel were ineffective for failing to raise a *Batson* challenge at trial, Galloway relies on *Flowers*, in which the Supreme Court stated that "[o]ur precedents allow criminal defendants raising *Batson* challenges to present a variety of evidence to support a claim that the prosecutor's peremptory strikes were made on the basis of race." 139 S. Ct. at 2243. The following factors were identified as:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

45

- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* Galloway goes to great lengths in providing his analysis of the first, third, fifth and sixth factors listed above. But, as the Court stated in *Clark v. State*, 343 So. 3d 943, 962 (Miss. 2022), *Flowers* reiterated factors that a defendant may present "to the trial court in support of the claim that a peremptory challenge was racially motivated." 343 So. 3d at 962. Here, there was no challenge to the State's peremptory strikes, and Galloway's reliance on the above referenced *Flowers* factors are not relevant here. There is no record and no opportunity given for the State to provide a race-neutral reason for striking jurors. In *Flowers*, the defense had made an on-the-record *Batson* challenge to the State's use of peremptory strikes during jury selection, and the trial judge was given an opportunity to access the matter. 139 S. Ct. at 2237. That did not happen here.

¶86. In *Wilcher*, 863 So. 2d 776, the Court was faced with the same issue Galloway raises here. Wilcher claimed that he was provided ineffective assistance of counsel when his attorney failed to make a *Batson* challenge. *Id.* at 819. The Court noted that "Wilcher's attorneys filed a motion prior to the beginning of trial that would preclude the prosecution from using peremptory challenges to exclude black jurors and members of other groups,

46

which evidences their awareness of the potential **Batson** issues." *Id.* This Court found:

> that the decision to make a **Batson** challenge falls within counsel's trial strategy and the wide latitude given to him. *See Strickland*, 466 U.S. at 686, 104 S. Ct. 2052; **Hiter v. State**, 660 So. 2d 961, 965 (Miss. 1995). For example, the defense may find it strategic to forego a **Batson** challenge and allow the State to exercise one of its peremptory challenges on a juror that the defense finds less favorable than a juror further down the list when, by all accounts, the defense attorney could have actually prevailed on a **Batson** challenge. Defense counsel is presumed competent. *Johnson v. State*, 476 So. 2d at 1204 (Miss. 1985).

*Id.*

¶87.    The Court also found "that the record before this Court is silent on the racial composition of the venire members" save one potential juror, and the jury was empaneled before he was selected. *Id.*   Wilcher provided an affidavit from one of his attorneys who stated that he made notes next to panel member's names on a list of venire members indicating if he or she was black. *Id.*  That list was attached as an exhibit to the affidavit. *Id.* This Court found the list to be inaccurate. *Id.* at 820.

¶88.    In Galloway's case, Attorney Rishel stated in his affidavit that he kept notes regarding the sex and race of each juror during voir dire.  The list was not attached to Attorney Rishel's affidavit, but it was provided as a separate exhibit, purportedly from defense counsels' files. It is important to note that Attorney Rishel also stated in his affidavit: "Had a **Batson** challenge been appropriate, we would have made one."  This evidences defense counsels' awareness of the potential **Batson** issues and their decision to not raise such a claim.

¶89.    Further, it matters not whether the Court finds that Attorney Rishel's list of potential

47

jurors' names accurately identified the black and white jurors. In ***Wilcher***, the Court held

that, "[e]ven if it is assumed that the five jurors at issue were black" as Wilcher contended,

> Wilcher has not proven that he was prejudiced in any fashion by his attorneys'
> decision not to assert a ***Batson*** challenge. Wilcher only complains that his
> attorneys' "failure to raise a ***Batson*** objection prejudiced [him] because it led
> to the exclusion of all African Americans from the jury, which was
> unrepresentative of the community." This Court has held that, "[a]lthough the
> defendant does have a right to be tried by a jury whose members were selected
> pursuant to a nondiscriminatory criteria, the ***Batson*** court noted that the Sixth
> Amendment to the Constitution of the United States has never been held to
> require that petit juries actually chosen must mirror the community and reflect
> the various distinctive groups in the populations." ***Simon v. State***, 688 So. 2d
> 791, 806 (Miss. 1997).

***Wilcher***, 863 So. 2d at 820 (alterations in original). Because of this, the Court concluded that

Wilcher failed to "overcome the presumption that, under the circumstances, the challenged

action 'might be considered sound trial strategy.'" ***Id.*** (internal quotation marks omitted)

(quoting ***Stringer***, 454 So. 2d at 477).

¶90.    In ***Ronk***, a more recent capital PCR proceeding discussing this same issue, the Court

held:

> We find this issue is waived. A trial objection is required to preserve a
> ***Batson*** claim for appeal. ***Thomas v. State***, 517 So. 2d 1285, 1287 (Miss.
> 1987). Even in capital cases, "a party who fails to object to the jury's
> composition before it is empaneled waives any right to complain thereafter."
> ***Keller v. State***, 138 So. 3d 817, 842 (Miss. 2014) (quoting ***Duplantis v. State***,
> 644 So. 2d 1235, 1245 (Miss. 1994)); *see also* ***Shaw v. State***, 540 So. 2d 26,
> 27 (Miss. 1989) (holding that any challenge to the jury's racial composition
> was waived when ***Batson*** was not raised during the jury-selection process and
> the record was silent on the venire's racial composition). While not binding
> here, several federal circuit courts of appeals have held a ***Batson*** claim cannot
> be asserted in a habeas petition if the petitioner did not object to the
> peremptory challenges at trial. ***Haney v. Adams***, 641 F.3d 1168, 1171, 1171

n.6 (9th Cir. 2011) (citing *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996); *Abu-Jamal v. Horn*, 520 F.3d 272 (3d Cir. 2008), *vacated on other grounds* by *Beard v. Abu-Jamal*, 558 U.S. 1143, 130 S. Ct. 1134, 175 L. Ed. 2d 967 (2010); *Allen v. Lee*, 366 F.3d 319, 327-28 (4th Cir. 2004); *Thomas v. Moore*, 866 F.2d 803, 804 (5th Cir. 1989); *Carter v. Hopkins*, 151 F. 3d 872, 875-76 (8th Cir. 1998); *Sledd v. McKune*, 71 F.3d 797, 799 (10th Cir. 1995)).

267 So. 3d at 1290. The Court in *Ronk* also relied on *Wilcher*, stating:

> *Wilcher v. State*, 863 So. 2d 776 (Miss. 2003), is especially insightful. There, we rejected Wilcher's claim that counsel was ineffective for failing to object to the State's use of peremptory challenges to exclude all five African-American venire members. *Wilcher*, 863 So.2d at 819. We noted the record was silent on the racial composition of the venire, making it impossible for us to determine if a *Batson* challenge was warranted, and if so, whether counsel's failure to make such challenge caused prejudice. *Id.* But we said even if the State had indeed struck all five African-American venire members, Wilcher still failed to show prejudice. *Id.* at 820. We explained that while defendants have a right to be tried by a jury selected based on nondiscriminatory criteria, the Constitution does not require the jury to "mirror the community and reflect the various distinctive groups in the populations." *Id.* (quoting *Simon v. State*, 688 So. 2d 791, 806 (Miss. 1997)).

267 So. 3d at 1291.

¶91. Notwithstanding the procedural bar of waiver, Galloway cannot show that his counsels' performance was deficient. And even if the Court were to assume, for the sake of argument, that counsel's performance was deficient, the fact that an all-white jury was empaneled is not evidence of prejudice. *Wilcher*, 863 So. 2d at 820.

### 2. Whether defense counsel failed to conduct constitutionally adequate voir dire.

¶92. Galloway claims that defense counsel failed to probe jurors about their ability to consider "a life verdict" if the case proceeded from the guilt phase to the penalty phase.

49

Galloway also contends that defense counsel asked no questions "about the jurors' ability to consider the alleged aggravating factors and the alleged mitigating factors impartially." And defense counsel "inexplicably failed to use tools routinely available to defense counsel in Harrison County capital cases, like jury questionnaires and individual, sequestered voir dire." Galloway submits that at least one juror (Juror Number 23), who ultimately sat on the jury, believed there could be no verdict other than death if Galloway was convicted and that death was the "only sentence it could be." Because defense counsel did not ask Juror Number 23 any individual questions, defense counsel did not know that she believes it is wrong for taxpayers to pay to incarcerate a defendant convicted of such a horrible crime.

¶93. This issue is procedurally barred. Galloway raised a voir dire challenge on direct appeal that there was a constitutionally inadequate voir dire because the trial court administered a petit juror oath before voir dire, which could have affected juror candor. This Court rejected the claim because a thorough voir dire was conducted, with approval from the trial court, along with questioning from trial court and counsel for both parties. *Galloway*, 122 So. 3d at 677-78. Galloway attempts to "relitigate the issue under a new heading." *Wiley v. State*, 750 So. 2d 1193, 1200 (Miss. 1999) (internal quotation mark omittted) (quoting *Foster*, 687 So. 2d at 1136). Procedural bar notwithstanding, there is no merit to claim.

¶94. First, Galloway's assertions as to what Juror Number 23 believed or said comes solely from an affidavit filed by an out-of-state attorney in August 2021, who assisted Galloway's

50

PCR attorney in 2014. Both interviewed Juror Number 23 in July 2014, asking her questions about her jury service in Galloway's case. There is no affidavit from Juror Number 23.

¶95. Further, PCR counsels' post-trial contact with Juror Number 23 may have violated the requirements set forth in *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407 (Miss. 1993). This Court recently addressed *Gladney* in a death-penalty PCR. *Batiste v. State* (*Batiste IV*), 337 So. 3d 1013, 1024-26 (Miss. 2022). *Gladney* recognized "a 'general reluctance' to reconvene and question jurors 'for potential instances of bias, misconduct[,] or extraneous influences' after a verdict has been reached, and such inquiries should not be entertained where it is a 'mere fishing expedition.'" *Batiste IV*, 337 So. 3d at 1024 (alterations in original) (internal quotation marks omitted) (quoting *Roach v. State*, 116 So. 3d 126, 131 (Miss. 2013)).

> In light of this concern, the Court established a procedure for trial courts to utilize when allegations of juror misconduct or extraneous information improperly brought to the jury's attention are made." [*Roach*, 116 So. 3d] at 132 (citing *Gladney*, 625 So. 2d at 418). First, after a party informs the trial court of potential improper influence on the jury or juror misconduct, the court must determine if an investigation is warranted. *Id.* (citing *Gladney*, 625 So. 2d at 418). "An investigation is warranted if the trial judge finds that 'good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.'" *Id.* (quoting *Gladney*, 625 So. 2d at 419). Without a "threshold showing of external influences," the inquiry ceases. *Id.* (internal quotation marks omitted) (quoting *Gladney*, 625 So. 2d at 419).

*Batiste IV*, 337 So. 3d at 1024.

¶96. Ultimately, the trial court in *Batiste IV* found that the Mississippi Office of Post-Conviction Counsel had unlawfully obtained post-trial affidavits from certain jurors in the

51

case. *Id.* at 1025-26. And the trial court excluded their use in Batiste's claim that these jurors were subject to improper outside influence or had received extraneous prejudicial information during trial. *Id.* at 1025. This Court affirmed, stating:

> This Court has yet to recognize a blanket exclusion of evidence obtained in violation of *Gladney*. We do not choose to do so now. Rather, we leave such decisions to the sound discretion of the trial court. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." [*Gore v. State*, 37 So. 3d 1178, 1183 (Miss. 2010)] (internal quotation marks omitted) (quoting [*Price v. State*, 898 So. 2d 641, 653 (Miss. 2005)].

*Id.* at 1026.

¶97. *Batiste IV* commented in a footnote that "[i]t does not appear that this Court had been made aware of these violations when it handed down [*Batiste v. State* (*Batiste II*), 184 So. 3d 290 (Miss. 2016)]." *Batiste IV*, 337 So. 3d at 1016 n.1.

¶98. In *Batiste II*, this Court granted Batiste leave to file his PCR petition in the trial court based on his claim that certain statements, alleged to have been made by bailiffs to jurors, violated Batiste's constitutional right to an impartial jury. *Batiste II*, 184 So. 3d at 291. *Batiste II* noted that two juror affidavits were attached to Batiste's PCR petition. *Id.* According to this Court's docket, both affidavits were signed by those jurors, respectively, on May 1, 2014 (Exhibits 26 and 27). Since this Court had handed down Batiste's direct appeal in 2013, (*Batiste v. State (Batiste I)*, 121 So. 3d 808, 823 (Miss. 2013)), this Court had jurisdiction over the matter—at least when the affidavits were signed.

¶99. Because *Batiste II* granted leave to proceed in the trial court, the trial court had

jurisdiction to consider whether there had been a *Gladney* violation. There are no cases from this Court that explain or instruct how the *Gladney* framework should operate when the petitioner is seeking leave in this Court based on alleged juror misconduct that may entail a *Gladney* violation.

¶100. As the Court in *Batiste IV* pointed out, *Carr v. State*, 873 So. 2d 991, 1005-07 (Miss. 2004), applied *Gladney* in a death-penalty PCR involving allegations of conduct occurring years before. *Batiste IV*, 337 So. 3d at 1024. The Court in *Carr* found that jurors who had signed affidavits in support of the petitioner's claim of juror misconduct had been deceived, and it denied the petitioner's application for leave to proceed in the trial court on that particular PCR claim. *Carr*, 873 So. 2d at 1005-06.

¶101. That said, and irrespective of whether a *Gladney* violation occurred here or not, what Juror Number 23 purportedly told PCR counsel according to PCR counsel's affidavit is hearsay and should not be considered. *Spicer v. State*, 973 So. 2d 184, 205 (Miss. 2007) (affidavit from private investigator who interviewed four jurors post-trial and reported what they told him amounted "to nothing more than hearsay"). Juror Number 23's purported statements to PCR counsel clearly could have been taken out of context. And even if Juror Number 23 actually said what she purportedly told PCR counsel, this does not mean that Juror Number 23 failed in "the performance of [her] duties as a juror in accordance with [the trial court's] instructions and [her] oath." *Wilcher*, 863 So. 2d at 814 (alterations in original) (internal quotation marks omitted) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.

53

Ct. 844, 83 L. Ed. 2d 841 (1985)).

¶102. This Court presumes that jurors follow the trial court's instructions. *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985). "To presume otherwise would render the jury system inoperable." *Id.* Nothing that Galloway submits with regard to Juror Number 23 overcomes this presumption, particularly when predicated on third-party hearsay.

¶103. As to Galloway's other contentions, this Court has held that "[a]n attorney's actions during voir dire are considered to be a matter of trial strategy and as such, cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Bell v. State*, 879 So. 2d 423, 436 (Miss. 2004) (quoting *Burns v. State*, 813 So. 2d 668, 676 (Miss. 2001)). There is no such showing from the record.

¶104. Contrary to Galloway's assertions, the record shows that numerous prospective jurors who had indicated that they could not consider the death penalty or that they may automatically apply it were individually voir dired to determine whether or not they actually had an inability to follow the law. And defense counsel thoroughly participated throughout the examinations.

¶105. Specifically, as the record shows and as this Court found on direct on appeal in this case, eleven prospective jurors indicated that they could not impose the death penalty under any circumstances. *Galloway*, 122 So. 3d at 678. Ten prospective jurors indicated that they would automatically impose the death penalty. *Id.* Upon further examination during

54

individual voir dire by the trial court and attorneys from both sides, one of the eleven prospective jurors, who had initially indicated that he absolutely opposed the death penalty, withdrew his original response. *Id.* This prospective juror stated that he could consider the death penalty under appropriate circumstances. *Id.* And four of the ten prospective jurors who initially indicated they would automatically impose the death penalty changed their responses and stated that they would not indiscriminately impose it. *Id.* "They told the court they would consider [any] aggravating and mitigating circumstance and could make a determination whether life in prison without parole should be imposed." *Id.*

¶106. The record contravenes Galloway's claim that defense counsel (or the trial court) failed to conduct constitutionally adequate voir dire. This issue is without merit.

    **C.**     **Whether trial counsel provided ineffective assistance during the guilt-innocence phase.**

        **1.**     **Whether trial counsel was ineffective for failing to investigate and challenge the expert testimony of Dr. McGarry.**[2]

¶107. Galloway's capital murder conviction was based on the underlying felony of sexual

---

    [2]     The record shows that Dr. McGarry is a forensic pathologist, licensed in Mississippi and Louisiana. He has been licensed for fifty years. He is board-certified in general pathology, forensic pathology, and neuropathology. He is a professor at LSU School of Medicine. He has performed more than 13,000 autopsies, and he has testified as an expert hundreds of times in both state and federal courts.

*Galloway*, 122 So. 3d at 630 n.1.

battery by anal penetration, and Dr. McGarry's testimony was the only evidence of anal sexual battery presented to the jury. It was Dr. McGarry's testimony that the injuries to Anderson's anus were caused from penetration by a penis. Galloway now asserts that his trial counsel failed to adequately investigate and challenge Dr. McGarry's forensic testimony.

¶108. As to the failure to investigate, Galloway maintains that his attorneys would have discovered that Dr. McGarry had been fired by the New Orleans Parish Coroner purportedly six months prior to Galloway's trial. Galloway also describes several autopsies performed by Dr. McGarry that are alleged to have been inaccurate, false, and/or unreliable. The crux of Galloway's argument is, had counsel investigated Dr. McGarry's background, they could have challenged his expertise.

¶109. Galloway also claims that if his counsel had conducted even a cursory search of prior legal challenges to Dr. McGarry's testimony, they would have discovered *Harrison v. State*, 635 So. 2d 894 (Miss. 1994). Galloway claims that case is "a notorious capital murder case along the Gulf Coast, [in which] a defendant received a new trial due to the prosecution's 'ambush' of the defense with the undisclosed expert opinion of Dr. McGarry."[3] Notably,

_____

[3] In *Harrison v. State*, Dr. McGarry was permitted to give his opinions on the possible causes of certain injuries and their temporal relationship to the victim's death. 635 So. 2d at 898. It was clear, however, that the State had failed to provide this evidence to the defense. *Id.* Dr. McGarry also stated that the victim was conscious when certain injuries were inflicted. *Id.* at 898-99. "Most significantly, the undisclosed opinion of McGarry that April Turner was raped was the only evidence offered to prove this critical aspect of the State's case." *Id.* at 899.

Defense counsel was aware that Dr. McGarry was going to testify as an expert for the

however, that case was not reversed and remanded due to the content of Dr. McGarry's testimony but because of the trial court's "disregard of the remedial measures established in *Box*. *Harrison*, 635 So. 2d at 899.

¶110. Galloway also offers the April 30, 1992, affidavit of Dr. Gerald Liuzza, M.D., who at the time attested to being an Assistant Professor of Pathology at Louisiana State University Medical Center. Notably, the affidavit predates Galloway's offense by nearly sixteen and a half years. The affidavit was submitted as part of the direct appeal in *Harrison*. *See id.* at 902 n.2. Dr. Liuzza stated that "[i]t is generally held that a forensic pathologist cannot reach a valid conclusion within a reasonable degree of medical certainty based on autopsy findings

---

prosecution. *Id.* The defense objected, however, claiming that it was not aware "Dr. McGarry was going to render these types of opinion." *Id.* "[T]he trial court overruled all objections based on inadequate discovery responses and denied defense counsel's attempts to invoke the procedures set out in *Box* [*v. State*, 437 So. 2d 19, 22-26 (Miss. 1983)]." *Harrison*, 635 So. 2d at 899. This Court reversed and rendered, stating:

> In *Holland* [*v. State*, 587 So. 2d 848, 867 (Miss. 1991),] the trial Judge afforded the defense an "unlimited opportunity" to interview the State's expert. *Id.* No such opportunity was given to Harrison, as no attempt was made to comply with *Box*. This Court cannot countenance or condone the willful withholding of crucial evidence during discovery nor the flagrant disregard of the remedial measures established in *Box*. Accordingly, Harrison's conviction and sentence must be reversed. This is not to say that we are blind to the fact that Harrison's counsel exploited the prosecution's mistake by not using every means at his disposal to obtain the opinions of Dr. McGarry. This is especially true in light of the content of the autopsy report furnished to the defense well in advance of trial. Had the lower court complied with the requirements of *Box*, we would no doubt reach the same conclusion as we did in *Holland*.

*Harrison*, 635 So. 2d at 900.

and laboratory results that a particular wound was caused by a penis." These argument are aimed at attacking the scope of the testimony given by Dr. McGarry at Galloway's trial, which is barred.

¶111. Galloway's first issue on direct appeal was a direct attack on Dr. McGarry's testimony, referring to its use in support of the State's allegation of anal sexual battery as being based on "junk science." *Galloway*, 122 So. 3d at 628-33. After a thorough analysis of the issue, including Mississippi's modified *Daubert* [4] analysis, the Court found no merit. *Galloway*, 122 So. 3d at 632. It noted that Galloway was afforded his own expert to rebut Dr. McGarry's opinion. *Id.* at 633. Further, the Court said it "cannot say Dr. McGarry's opinion that the anal tear was evidence of 'anal rape' went beyond his scope of expertise or improperly invaded the province of the jury. For these reasons, we find no reversible error in this issue." *Id.*

¶112. In his fourth issue on direct appeal, Galloway charged that his trial counsel were "ineffective for failing to object to critical aspects of Dr. McGarry's testimony." *Id.* at 628, 638-42. The Court addressed the issue on the merits and found it lacking. *Id.* at 642.

¶113. The eighth issue raised by Galloway alleged prosecutorial misconduct for, in part, "present[ing] and rel[ying] heavily on Dr. McGarry's scientifically unreliable and, therefore, false and highly misleading testimony." *Id.* at 642. The Court held that "Dr. McGarry's

---

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

58

testimony presented no reversible error, and the State was permitted to rely on it during its summation of the evidence." *Id.* at 643.

¶114. Galloway's nineteenth claim on direct appeal challenged the sufficiency of the evidence of the predicated felony of sexual battery. *Id.* at 664. His argument was premised, in part, on the assertion that, "if Dr. McGarry had given scientifically valid testimony that the injury was consistent with nonconsensual, anal penetration, the evidence would have been insufficient to support a finding of guilt beyond a reasonable doubt as to the predicate felony of anal sexual battery." *Id.* at 664-65. As it had previously found in the first issue, the Court again found that "Dr. McGarry's opinion that the anal tear was evidence of 'anal rape' did not go beyond his scope of expertise and did not improperly invade the province of the jury." *Id.* at 667.

¶115. In today's petition, Galloway claims that counsel failed to conduct a reasonable investigation of Dr. McGarry and his testimony, failed to interview Dr. McGarry, failed to object to his "unreliable and prejudicial" testimony, and failed to file a pretrial *Daubert* challenge to Dr. McGarry's testimony. He also asserts that defense counsel should have interviewed other attorneys who have had the opportunity to cross-examine Dr. McGarry in other trials. This ineffective assistance of counsel claim is barred. It is a repackaged attack on the testimony of Dr. McGarry. "Issues presented through direct appeal are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Wilcher*, 863 So. 2d at 807 (citing *Foster*, 687 So. 2d at 1129). It is Galloway's burden to demonstrate

that his claims are not procedurally barred. *Moffett*, 351 So. 3d at 942; Miss. Code Ann. § 99-39-21(6) (Rev. 2020).

¶116. The Court found on direct appeal that Dr. McGarry's testimony was permissible. It also noted that Galloway was afforded an expert to rebut Dr. McGarry's testimony, and the Court addressed Mississippi's modified *Daubert* test.

> Thus, this issue is *res adjudicata*. That is, [the petitioner] unsuccessfully argued the merits of the issue on appeal, and now 'is attempting to relitigate this issue under a new heading.' See *Foster*, 687 So. 2d at 1136. Where the merits of the issue have been considered and rejected on direct appeal, and the appellant 'has merely camouflaged the issue by couching the claim as ineffective assistance of counsel', the doctrine of *res adjudicata* applies. *See id.* at 1135–37. If the merits of the underlying issue have been considered and rejected on direct appeal, then the appellant cannot show deficiency or prejudice in counsel's performance with regard to that issue. See *id.* Therefore, [the petitioner's] argument is res adjudicata and without merit.

*Wilcher*, 863 So. 2d at 805 (alterations in original) (quoting *Wiley*, 750 So. 2d at 1200).

¶117. Notwithstanding the bar, Galloway cannot show that counsel's performance was deficient. "Complaints concerning counsel's failure to file certain motions, call certain witnesses, ask certain questions, and make certain objections fall within the ambit of trial strategy." *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995) (citing *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984)). The defense attorneys in this case were familiar with Dr. McGarry. For instance, Attorney Stewart stated: "The case at the guilt phase was a battle of the experts. Our strategy was to get [Dr. McGarry] off the stand as quickly as possible."

> It's hard to challenge him on a lot of things. He's the expert of all experts. Because Dr. McGarry is so experienced, we don't generally challenge the substance of his testimony under Mississippi Rule of Evidence 702. It's hard

60

to challenge him because he's done tens of thousands of autopsies.

Further, Attorney Christensen stated in her affidavit:

> Our strategy with him is always to get him off the stand as quickly as possible. We did not consider challenging him under Mississippi Rule of Evidence 702. We did not consider talking to Dr. McGarry before trial about his opinions because we knew what he was going to say[.] We have tried to talk to him before trial on another case, and he did not speak with us.

> I did know at the time of Leslie's trial that Dr. McGarry had been terminated from the Orleans Parish Coroner's Office.

Both of these attorneys' statements demonstrate their familiarity with Dr. McGarry, his testimony, and that there was a strategy in dealing with Dr. McGarry. Counsel is presumed competent, and the failure to file certain motions falls within the ambit of trial strategy. *Cole*, 666 So. 2d at 777. "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." *Garcia v. State*, 356 So. 3d 101, 111 (Miss. 2023) (internal quotation marks omitted) (quoting *Ross*, 954 So. 2d at 1004).

¶118. Further still, at least one of Galloway's counsel knew that Dr. McGarry had been terminated from his employment with the Orleans Parish Coroner.[5] Counsel cannot be found to be deficient for failing to discover what was already known. Despite Dr. McGarry's termination from the Orleans Parish Coroner's Office, he was still employed by the Harrison

---

[5] Attorney Stewart stated that he knew Dr. McGarry had been terminated, but he could not recall how he learned of the information. Attorney Rishel stated that he did not know.

County Coroner's Office at the time of Galloway's trial. According to Attorney Rishel's affidavit (at the time he signed it in preparation for this PCR), Dr. McGarry was still employed by the Harrison County Coroner's Office, and Attorney Rishel had cross-examined him several times since Galloway's trial. We find that this issue is barred. Notwithstanding the bar, Galloway cannot show that counsel's performance was deficient.

2. **Whether trial counsel were ineffective for limiting the review of Galloway's forensic expert, Dr. LeRoy Riddick, and failing to consult with and prepare him.**

¶119. Dr. LeRoy Riddick, a board-certified pathologist, had served as the state medical examiner for Alabama from 1979-2006, among several other notable positions. Dr. Riddick was also the recipient of prestigious national awards in the forensic sciences. Galloway claims that defense counsel were ineffective for limiting the scope of Dr. Riddick's review to just the sexual battery aspect of his capital murder charge. He also asserts that his trial counsel failed to adequately interview, prepare, and present the testimony of Dr. Riddick. He specifically asserts that defense counsel never met with Dr. Riddick, by which they could have learned of Dr. Riddick's prior experiences with Dr. McGarry's testimonies, and never asked Dr. Riddick for his opinion on the adequacy and accuracy of Dr. McGarry's autopsy. Galloway argues that these failures constitute ineffective assistance of counsel.

¶120. Regarding defense counsels' failure to meet with Dr. Riddick prior to trial, Galloway cites *Hinton v. Alabama*, 571 U.S. 263, 134 S. Ct. 1081, 188 L. Ed. 2d 1 (2014). It is Galloway's assertion that the Supreme Court of the United States vacated the judgment of

the Alabama Criminal Court of Appeals and remanded the case, finding ineffective assistance of counsel because defense counsel failed to obtain sufficient expert assistance to rebut the state's expert and recognizing that, in some criminal cases, "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." **Hinton**, 571 U.S. at 273 (internal quotation mark omitted) (citing **Harrington**, 562 U.S. at 106).

¶121. Galloway's case was a case in which an expert was arguably necessary. Defense counsel knew from past experience that "Dr. McGarry is very convincing to juries. The jury believes everything out of his mouth." The defense retained Dr. Riddick and called him to testify at trial. The question Galloway posits is whether trial counsel were ineffective for failing to meet with and prepare Dr. Riddick prior to trial. **Hinton** does not answer that question.[6]

---

[6] In **Hinton**, six bullets had been recovered from three separate crime scenes. "The State's case turned on whether its expert witnesses could convince the jury that the six recovered bullets had indeed been fired from the Hinton revolver." 571 U.S. at 265. Defense counsel and the trial court were under the mistaken belief that the defense was only allowed a total of $1,000 to hire an expert for rebuttal of the State's experts. **Id.** at 268. Defense counsel recognized that Payne was not a good expert, at least with respect to toolmark evidence. **Id.** at 273. "Nonetheless, he felt he was 'stuck' with Payne because he could not find a better expert willing to work for $1,000 and he believed that he was unable to obtain more than $1,000 to cover expert fees." **Id.** The Supreme Court held that "it was unreasonable for Hinton's lawyer to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a mistaken belief that available funding was capped at $1,000." **Id.** "We wish to be clear that the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough." **Id.** at 274-75. "The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state

¶122.  Galloway also cites *Isham v. State*, 161 So. 3d 1076, 1089 (Miss. 2015) (Randolph, P.J., concurring in result only), asserting that trial counsel's failure to prepare its own expert witness "cannot be deemed tactical." Galloway's reliance on that case is misplaced.  In *Isham*, the defendant was convicted in the Circuit Court of DeSoto County of one count of felonious child abuse. *Id.* at 1077.  Isham raised only one issue on appeal – whether the "trial court erred in refusing to provide him with the funds to hire an expert witness with regard to the nature of and cause of [the child's] injuries." *Id.* at 1080.  The trial court denied the motion, finding that defense counsel had not shown a concrete reason for requiring an expert and because the motion was untimely.  *Id.* at 1079.  The Court stated that, "although Isham filed the motion eleven days before trial was set to begin, the interest in providing a fair trial to the accused far outweighs the interest of the trial court in keeping a timely docket."  *Id.* at 1084. The Court held:

> [t]he trial court's denial of funds for the procurement of expert witnesses denied Jason Isham his due process rights under the Fourteenth Amendment to the United States Constitution and Article 3, Section 14, of the Mississippi Constitution and denied him his right to a fair trial. Accordingly, we reverse Isham's conviction and remand the case for a new trial.

*Id.* at 1085.

¶123.  In an opinion concurring in result only, Presiding Justice Randolph found, that the trial judge did not misapply the law or abuse his discretion. *Id.* at 1085.  "Here, the record reveals

---

law made available to him—that caused counsel to employ an expert that he himself deemed inadequate." *Id.* at 275.

that deprivation was due to the actions or inactions of Isham's counsel, not trial-court error, for Isham's counsel failed to *timely* seek funding and/or to *timely* seek a continuance." *Id.* Isham was denied a fair trial due to the failure of defense counsel to consult expert witnesses and to schedule their appearances, and if funds were necessary for further consultation and their appearances, to *timely* seek same." *Id.* (emphasis added). In Galloway's case, defense counsels' procurement of Dr. Riddick as an expert and the timeliness in which he was retained are not in issue.

¶124. This case does not present an instance in which defense counsel failed to identify witnesses or failed to interview and call a witness to testify that the defendant identified as being important to the defense. *See Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) (trial counsel ineffective for failing to interview alibi witness the defendant provided to counsel prior to trial); *Payton v. State*, 708 So. 2d 559, 561 (Miss. 1998) ("[A]t a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." (alteration in original) (internal quotation marks omitted) (quoting *Ferguson v. State*, 507 So. 2d 94, 96 (Miss. 1987))). The argument here is that counsel failed to interview a retained expert witness prior to trial. Dr. Riddick, however, had already informed the defense in writing of his opinion.

¶125. At trial, Dr. Riddick testified that he had testified as an expert in forensic pathology "all [totaled] about 500 times plus or minus. Primarily in Mobile County, but also Washington D. C. , the [S]tate of Florida, State of Mississippi, State of Louisiana, State of

Tennessee, State of Virginia, and I testified in this courtroom I believe in both Harrison County, Jackson County, Greene County and George County." Dr. Riddick also stated in his affidavit that he has been called as a witness for the prosecution in four Mississippi homicide cases, including capital murder.[7] He has listed three other cases, aside from Galloway's, in which he gave expert testimony for the defense in Mississippi capital murder cases.[8] In at least two of those, ***Evans v. State***, 725 So. 2d 613 (Miss. 1997), and ***Holland v. State***, 705 So. 2d 307 (Miss. 1997), Dr. Riddick was retained to refute Dr. McGarry's expert testimony. He also identified two civil cases in Mississippi in which he testified as an expert.[9] Dr. Riddick identified seven capital murder cases and one murder case outside of Mississippi in which he testified as an expert for the prosecution.[10]

---

[7] ***James v. State***, 777 So. 2d 682, 690 (Miss. Ct. App. 2000) (capital murder); ***Fisher v. State***, 481 So. 2d 203, 208 (Miss. 1985) (capital murder); ***Simpson v. State***, 993 So. 2d 400, 404 (Miss. Ct. App. 2008) (manslaughter), and ***Starns v. State***, 867 So. 2d 227, 229, 234 (Miss. 2003) (murder).

[8] ***Jordan v. State***, 912 So. 2d 800 (Miss. 2005) (retained by defense in capital murder prosecution); ***Shaffer v. State***, 740 So. 2d 273, 277 (Miss. 1998) (retained by defense in capital murder prosecution); ***Holland v. State***, 705 So. 2d 307, 322 (Miss. 1997) (testimony proffered by defense to challenge Dr. McGarry's testimony in capital murder prosecution); ***Evans v. State***, 725 So. 2d 671, 613, 673 (Miss. 1997) (called by defense in capital murder prosecution).

[9] ***Miss. Crime Lab'y v. Douglas***, 70 So. 3d 196, 200 (Miss. 2011) (Dr. Riddick performed a second autopsy on the child, concluding he had died of natural causes); ***Univ. of Miss. Med. Ctr. v. Johnson***, 977 So. 2d 1145, 1150, 1154, 1155-56 (Miss. App. 2007) (Dr. Riddick was retained by UMMC in medical malpractice action).

[10] ***Hutcherson v. State***, 677 So. 2d 1174, 1178 (Ala. Crim. App. 1994) (death sentence); ***Martin v. State***, 931 So. 2d 774, 781 (Ala. Crim. App. 2005) (death sentence); ***Peraita v. State***, 897 So. 2d 1161, 1178 (Ala. Crim. App. 2003) (death sentence); ***Ziegler v.***

¶126. One of the defense's primary strategies was to show the jury that there had been no sexual battery. Attorney Stewart stated in his affidavit that, "[i]f there was not a sexual battery, then [Galloway] obviously could not get the death penalty." According to Dr. Riddick, Attorney Christensen contacted him to render an opinion about the charge of sexual assault in Galloway's case. Attorney Christensen sent him materials to review during the spring of 2010. Those documents included the autopsy report of Anderson, a Mississippi Crime Laboratory Report, and multiple photographs of the autopsy and crime scene.

¶127. On August 16, 2010, Dr. Riddick wrote a letter to Attorney Christensen, explaining his findings based on the documents he had received and reviewed. In relevant part, in his letter to Attorney Christensen, Dr. Riddick stated:

1.      With respect to the abrasions around the anus. The crushing injuries to the pelvis when the car ran over the victim while she was on the ground could have spread the buttocks apart and exposed the perianal region to the rough surface of the ground and/or caused friction between the buttocks while these crushing forces were inflicted. These injuries are described as abrasions, which are scrapes.

2.      The analysis of the swabs taken from the vagina indicated that there were two sources of the spermatozoa with one fraction being greater than the other. It would be helpful to determine which donor supplied the greater amount

3.      No swabs of the rectum were taken and none analyzed, thus *there was*

*State*, 886 So. 2d 127, 130 (Ala. Crim. App. 2003) (death sentence); *Clark v. State*, 896 So. 2d 584, 599 (Ala. Crim. App. 2000) (death sentence); *Thomas v. State*, 824 So. 2d 1, 40 (Ala. Crim. App. 1999) (death sentence); *Lucas v. State*, 792 So. 2d 1161, 1164 (Ala. Crim. App. 1999) (death sentence); *Williams v. Mosley*, No. Civ. A. 03-0050-CG-M, 2005 WL 1026742, *2 (S.D. Ala. 2005) (murder, life sentence).

*no definitive physical evidence of anal penetration.*

(Emphasis added.) From this letter, defense counsel received the answers to the questions they were seeking in order to achieve their strategy. The decision, at that point, not to expend further time and effort interviewing Dr. Riddick prior to trial is not deficient performance. "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." ***Garcia***, 356 So. 3d at 111 (internal quotation marks omitted) (quoting ***Ross***, 954 So. 2d at 1004).

¶128. Galloway also faults his attorneys for limiting Dr. Riddick's expertise to just the sexual battery aspect of his capital murder charge. Galloway argues that Dr. Riddick has testified as an expert in numerous capital cases in Mississippi and, according to Dr. Riddick, it was unusual for trial counsel to ask only for an opinion about the sexual assault charge. Dr. Riddick stated in his affidavit:

> Trial counsel typically would ask me to consult about the whole case, beginning with whether or not there was a homicide. Defense counsel usually [would] ask me to review and form opinions about the adequacy and accuracy of the autopsy and the cause of death. Mr. Galloway's defense counsel did not ask me to conduct such a review.

¶129. As discussed above, it was clearly the strategy of Galloway's defense team to challenge the sexual battery charge and remove the threat of the death penalty. It is the trial attorneys who are in the best position to determine trial strategy, not their witnesses. Whether attorneys in other trials employ differing tactics does not render Galloway's counsel deficient in his.

¶130. Further, as the State points out, Galloway's counsel made a reasonably compelling case to rebut Dr. McGarry's testimony regarding anal sexual battery when examining Dr. Riddick:

> [Attorney Christensen]: Okay. Can you form an opinion as to the condition of the anus with respect to whether there was penetration?
>
> [Dr. Riddick]: Both the vagina and the anus were dilated, and when people are dying and when they're dead, all the sphincters dilate, they relax. And so that is just a process of dying. Moreover the victim in this case had decomposed, and so there is even more changes in the size of - or muscles relax because she was out of rigor mortis, and so it's going to be dilated on that account. There were also injuries to the anus. There was three quarter inch by one quarter inch of the anus at the posterior region and extended into the mucosa. Therefore several things about this. As Dr. McGarry described in his autopsy report, the body had rolling crushing injuries, and there was extensive injuries to the pelvis, chest, upper extremities, head. And having been run over by a car, there [were] actually tire marks there. *And in my opinion because she was run over and she was crushed, that the tear in the anus could be produced by the stretching of the buttocks, and you can make a small tear in that way.* There is a medical condition known as fissure in ano, in which you can get a fissure around the anus from just having strained at the stool or having large very difficult bowel movements. So there is evidence that you can get injury there from that sort of pressure.
>
> [Attorney Christensen]: And was there any other findings to indicate there was sexual penetration of the anus?
>
> [Dr. Riddick]: *One thing about the anus, there was no semen. There was no material that they could find any semen or any DNA from the anus.*

(Emphasis added.) With regard to the tear in Anderson's anus, Dr. Riddick testified on cross-examination "that the body on the ground being crushed, that the buttocks could spread apart and therefore produce a small tear." That testimony reasonably rebutted Dr. McGarry's testimony that the tear could only have been produced by a penis through nonconsensual sex.

¶131. Galloway's claim that his trial counsel necessarily failed in their duty to challenge the State's evidence by failing to prepare and consult with Dr. Riddick on anything but the narrow topic of sexual battery is without merit. Galloway has not shown that defense counsel's examination and the presentation of Dr. Riddick's testimony was deficient. Therefore, he has failed to satisfy the first prong of *Strickland*, and the issue must fail.

**3. Whether trial counsel were ineffective for failing to lodge a Mississippi Rule of Evidence 702 pretrial challenge to Dr. McGarry's testimony.**

¶132. Galloway starts his argument by asserting:

> Dr. McGarry's opinions did not come close to meeting the standard set out in Mississippi Rule of Evidence 702 as construed by this Court. His testimony has not undergone peer review or publication, has no known error rate or standards of research, and there is no indication in the literature that the forensic pathologist community generally accepts the reliability or scientific bases of the methods, procedures, and theories, if any, that Dr. McGarry used in forming his opinions.

He maintains that trial counsel were ineffective for failing to file a pretrial motion for a *Daubert* hearing.

¶133. This issue was discussed above. As stated before, Galloway challenged Dr. McGarry's testimony, which Galloway described as "junk science," on direct appeal. This Court discussed Mississippi's modified *Daubert* standard, explaining that Dr. McGarry had given almost identical testimony in *Holland v. State (Holland I)*, 587 So. 2d 848, 874-75 (Miss. 1991); *Galloway*, 122 So. 3d at 632. In Galloway's recitation of *Holland*, Dr. McGarry testified as to the autopsy findings as follows:

70

The first injuries were of the face, over the sides of the face, over the center of the face, the lips, over the nose, the eyes, they were more swollen, they were the most advanced. About the same time frame, next in line, the injuries of the arms, forearms, wrists, knees, shins. In that same time pattern, the injuries to the genital region, the stretching and scraping and tearing of the vagina and rectal tissues . . . . These are produced by forceful penetration of the vagina and rectum by a structure that is able to distend and stretch and tear in a symmetrical pattern. In other words, a round—a roughly round structure penetrating and stretching the vagina and stretching the anus and rectum. . . . In order to produce these injuries all the [sic] around the edge, it has to be something not as firm and unyielding as a metal or wooden instrument. It has to be a part of a human body or something with that same texture consistency[—like a] male sex organ.

122 So. 3d at 632 (alterations in original) (quoting *Holland*, 587 So. 2d at 874-75). The *Galloway* Court explained that, although Holland's conviction for capital murder was affirmed, his case was remanded for a new sentencing hearing due to the jury's having prematurely deliberated Holland's sentence. *Id.*

¶134. Holland was resentenced to death following his second sentencing hearing. *Holland v. State (Holland II),* 705 So. 2d 307, 318 (Miss. 1997). On appeal, his counsel asserted that the trial court had erred by denying the defense's motion to enjoin Dr. McGarry's testimony. *Id.* at 341. The Court held that the issue was barred because Holland had failed to object to the testimony during the guilt phase. *Id.* Despite the procedural bar, the *Holland II* Court discussed the issue and found it to be without merit, finding that the State "had demonstrated that Dr. McGarry's testimony fell within the bounds of forensic pathology by demonstrating that his expertise dealt with wounds, suffering, and the means of infliction of injury." *Id.*

71

¶135. In Galloway's appeal, the Court held: "We cannot say Dr. McGarry's opinion that the anal tear was evidence of 'anal rape' went beyond his scope of expertise or improperly invaded the province of the jury. For these reasons, we find no reversible error in this issue." *Galloway*, 122 So. 3d at 633. The issue is procedurally barred by *res judicata*. Miss. Code Ann. § 99-39-21(3) (Rev. 2020). Galloway cannot relitigate this claim under the guise of ineffective assistance of counsel. *Wilcher*, 863 So. 2d at 805.

**4.  Whether trial counsel were ineffective for failing to object to Dr. McGarry's testimony as beyond the scope of the disclosed nature of his testimony.**

¶136. Very similar to the last issue, Galloway now asserts a discovery violation occurred: the State failed to disclose the nature of Dr. McGarry's testimony, specifically that the cause of Anderson's anal tear was from penetration by a penis. While the previously discussed issue pertained to whether such testimony went beyond the scope of Dr. McGarry's expertise, Galloway claims that such testimony went beyond what the State had disclosed would be Dr. McGarry's testimony at trial. Specifically, Galloway asserts that Dr. McGarry's testimony that Anderson "had the injury of forceful penetration by a penis" was outside of discovery.

¶137. This claim of ineffective assistance of counsel was capable of being raised on direct appeal. Had there been a discovery violation, and counsel did object, the matter could have been addressed by the trial court and reviewed on direct appeal. Galloway's claim that counsel were ineffective for failing to object was also capable of being raised on direct appeal. Both the underlying issue and the ineffective assistance of counsel claim have been

72

waived. Miss. Code Ann. § 99-39-21(1) (Rev. 2020); Miss. R. App. P. 22(b).

Notwithstanding the procedural bar, the claim is without merit.

¶138. The prosecution sent Galloway's counsel a letter, dated March 25, 2010, [11] containing

a list of potential witnesses, including four experts, to be called at trial. Dr. McGarry was

one of the experts, and the letter provided a synopsis of his expected testimony, as follows:

> *Dr. Paul McGarry is expected to testify as an expert based upon his education, experience and training. He will testify based upon his observations, information received, autopsy procedures performed, and based upon his report. His testimony is expected to include the cause of death, the manner of death, and the type of injuries sustained and their effect on the body or the continuance of life, whether any weapon appeared to have been used and the type, and the method of infliction of the injuries.

¶139. In a subsequent letter sent to Galloway's counsel, dated April 16, 2010, the

prosecution was more specific regarding Dr. McGarry's proposed testimony:

> In light of your recent concerns involving the underlying felony in this case, sexual battery, I would reiterate what was pointed out at the preliminary hearing and what is documented in Dr. McGarry's Autopsy Protocol. Specifically, when examined, the victim had a "dilated vagina and rectum, lacerated anal mucosa, abrasions of the anal edges." As noted during the preliminary hearing, *Dr. McGarry will testify that this is consistent with sexual battery. Specifically, the injuries caused to the victims rectum and anal area would cause a degree of pain that would not be tolerated or withstood during consensual sexual activities.*

(Emphasis added.) In relevant part, at the time of Galloway's crime sexual battery is defined,

as "(1) A person is guilty of sexual battery if he or she engages in sexual penetration with:

(a) Another person without his or her consent[.]" Miss. Code Ann. § 97-3-95 (Rev. 2006).

---

[11] The letter was filed with the trial court clerk on March 26, 2010.

¶140. Dr. McGarry's testimony, which Galloway asserts was a discovery violation, was covered in the letter dated April 16, 2019. Further, the letter prompted Attorney Christensen to file a motion seeking funds to hire Dr. Riddick and a continuance of the trial date.[12] Because Dr. McGarry's testimony was not outside the scope of disclosed testimony, defense counsel was not deficient by failing to lodge an objection. *Branch v. State*, 882 So. 2d 36, 60 (Miss. 2004) ("Failure to raise a meritless objection is not ineffective lawyering." (citing *Brown v. State*, 798 So. 2d 481, 494 (Miss. 2001))).

### 5. Prejudice

¶141. Here, Galloway argues that he was prejudiced by each of the four previous alleged errors of counsel, i.e., failing to investigate and challenge the testimony of Dr. McGarry, limiting Dr. Riddick's review to the sexual battery charge, failing to file a Rule 702 challenge to Dr. McGarry's testimony, and failing to object to Dr. McGarry's testimony's being outside the scope of discovery.

¶142. If Galloway's ineffective assistance of counsel claims fail on either of the *Strickland* prongs, his claims must fail. *Moffett*, 351 So. 3d at 945. As previously discussed, Galloway's claims fail to meet even the first prong in *Strickland*. Therefore, Galloway's

---

[12] On April 23, 2010, Attorney Christensen filed a motion for funds to hire Dr. Riddick, acknowledged receipt of a letter on April 19, 2010, "from the State indicating Dr. McGarry's opinions," and she expressed the need for Dr. Riddick to review Dr. McGarry's findings and to assist in Galloway's defense. On May 4, 2010, Attorney Christensen filed a motion for a continuance of the trial, stating that more time was needed to consult with the defense's forensic expert.

claims of ineffective assistance of counsel must fail. *Id.*

> **II.** **Whether the state corrupted the truth-seeking function of the trial by suppressing material impeachment evidence regarding Dr. McGarry, in violation of the petitioner's rights under the United States Constitution, the Mississippi Constitution, and Mississippi law.**

¶143. Under this assignment of error, Galloway asserts that the State knew or should have a known that, just months prior to Galloway's trial, Dr. McGarry had been terminated from his twenty-five-year tenure at the Orleans Parish Coroner's Office. Dr. McGarry testified that he had been terminated from the office following his autopsy of Cayne Miceli in 2009. Galloway cites the transcript of the criminal trial in the United States District Court, Eastern District of Louisiana, in *Williams v. United States* Number 10-cr-213. Galloway provided portions of that transcript discussing the circumstances of Dr. McGarry's termination from employment with the Orleans Parish Coroner's Office. Interestingly, the trial in *Williams* took place on April 7, 2011. Galloway's trial predates *Williams*, spanning September 21-24, 2010.

¶144. Galloway states that his defense counsel requested discovery of "any materials required by United S[t]ates Supreme Court Decisions or Mississippi Supreme Court decisions or other Rules of in [sic] the state of Mississippi or the United States or the United States Constitution." He argues that information pertaining to Dr. McGarry's termination would have been favorable to his defense and that the prosecution failed to reveal this information.

75

¶145. Under the Due Process Clause of the Fourteenth Amendment, the prosecution has a duty to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment[.]" *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The Court adopted a four part test in *King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995), to assess whether a *Brady* violation had taken place. "Under the test, it is the defendant's burden to prove: '(a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.'" *Havard v. State*, 86 So. 3d 896, 900 (Miss. 2012) (quoting *Manning v. State*, 929 So. 2d 885, 891 (Miss. 2006)).

¶146. The issue here is similar to Galloway's earlier issue regarding whether his trial counsel were ineffective for failing to investigate Dr. McGarry and discover that he had been terminated. Here, Galloway faults the prosecutor for an alleged discovery violation. In the related issue previously discussed, Galloway claimed that attorneys along the Gulf Coast had long been aware of the deficiencies of Dr. McGarry's autopsies. Interestingly, the two publications he referenced to support that assertion were published or posted on February 1,

76

2011, after Galloway's trial ended.[13]    Even assuming that sources of that nature were published prior to Galloway's trial, that would not aid Galloway's claim because they would have been equally discoverable by the defense as they would have been by the prosecution. Galloway's argument fails the second part of the **Brady** test. *See **Carr**,* 873 So. 2d at 1000 ("With reasonable diligence he could have obtained the information himself, thus his argument fails the second part of the four-part **Brady** test."). "**Brady** does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence." **Kutzner v. Cockrell**, 303 F.3d 333, 336 (5th Cir. 2002) (citing **Rector v. Johnson**, 120 F.3d 551, 558 (5th Cir.1997).   Therefore, the prosecution would have been under no obligation to provide the defense with that information.

¶147.  Further, there can be no failure to disclose information to the defense if the defense already knew of the information.  **United States v. Brown**, 650 F.3d 581, 588 9 5th Cir. 2011).  As discussed above, at least one of Galloway's attorneys was aware that Dr. McGarry had been terminated from the Orleans Parish Coroner's Office.  Attorney Christensen stated: "I did know at the time of Leslie's trial that Dr. McGarry had been terminated from the Orleans Parish Coroner's Office."

---

[13] *See* Transcript*, Post Mortem: Death Investigation in America*, Frontline (Feb. 1, 2011); *see also* A.C. Thompson, Mosi Secret, Lowell Bergman, Sandra Bartlett, *In New Orleans, Uncovering Errors and Oversights*, National Public Radio (Feb. 1, 2011), https://www.npr.org/2011/02/01/133301618/in-new-orleans-uncovering-errors-and-oversi ghts.

¶148. This issue is without merit.

**III.    Whether the State corrupted the truth-seeking function of the trial by presenting false and misleading evidence, in violation of petitioner's Constitutional Rights under the United States and Mississippi Constitutions and Mississippi law.**

¶149. This issue is barred by res judicata.

¶150. Galloway alleges that the prosecution in his case allowed the presentation of false and misleading evidence during its examination of Dr. McGarry. He further asserts that because the jury's guilty verdict on the essential allegation of anal sexual battery hinged on Dr. McGarry's "false and misleading testimony," this Court should vacate Galloway's conviction or order the circuit court to conduct an evidentiary hearing on this issue. The alleged falsehoods include:

1.    That an anal tear is conclusive evidence of anal rape;

2.    That penetration of the anus sufficient to cause the observed injuries would be so painful as to rule out consensual sexual activity;

3.    That dilation of the anus was evidence of anal rape;

4.    That the anal injuries must have been caused by a penis, rather than another foreign object;

5.    That the anus is such a protected part of the human body that the observed injuries could not have been the result of an automobile rolling over Ms. Anderson's body;

6.    That there were no injuries to the perianal area.

¶151. Galloway specifically asserts that (1) Dr. McGarry gave false and highly misleading testimony inconsistent with scientific principles; (2) the prosecution knew or should have

78

known that this testimony was false and highly misleading; and (3) the State cannot prove beyond a reasonable doubt that its failure to correct the testimony did not contribute to the jury's verdict. "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]" *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (citing *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935)). "To establish a claim under *Napue*, a defendant must prove that the witness's testimony 'was (1) false, (2) known to be so by the state, and (3) material.' *United States v. Dvorin*, 817 F.3d 438, 452 (5th Cir. 2016) (quoting *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005)). This claim is another attack on Dr. McGarry's trial testimony.

¶152. On direct appeal, "[Galloway] claim[ed] that the certainty Dr. McGarry conveyed to the jury was *fictional* and constituted nothing more than *junk science*." *Galloway*, 122 So. 3d at 629 (emphasis added). Under a plain error analysis, the Court determined that the testimony was within Dr. McGarry's scope of expertise, that Galloway had been provided an expert of his own to rebut Dr. McGarry's testimony and opinion, and that there was no reversible error. *Id.* at 633. In short, the testimony was found to be permissible. Galloway now attacks that same testimony under the theory that the prosecution either knew or should have known that it was false.

> [T]he procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*.

79

The Petitioner carries the burden of demonstrating that his claim is not procedurally barred.

*Dickerson v. State*, 357 So. 3d 1010, 1018 (Miss. 2021) (quoting *Havard v. State*, 988 So. 2d 322, 333 (Miss. 2008)). This claim is merely another attack on Dr. McGarry's trial testimony, and it is barred by res judicata. Notwithstanding the procedural bar, the issue is also without merit.

¶153. In an attempt to show that the testimony was false, Galloway provided affidavits from six forensic pathologists and medical literature to establish that physical evidence of trauma to the anogenital area as observed at Anderson's autopsy implies nothing about consent. Galloway asserts that these affidavits establish that Dr. McGarry's testimony on the above enumerated points lack a basis in science, constituted false and highly misleading State's evidence, and should not have been admitted. As the State properly points out, however, the United State Court of Appeals for the Fifth Circuit has long acknowledged, and we find persuasive, that "the fact that other experts disagreed . . . is insufficient, by itself, to call [the expert's] testimony into question." *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996); *see also* *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000) (holding that disagreement between experts was insufficient to overcome state habeas court's factual determination that the prosecution expert's testimony was not false or misleading).

¶154. In *Boyle*, a federal habeas corpus proceeding on a capital murder/death sentence case, the petitioner attacked the State's expert's testimony based on the testimony of one expert at trial, and two experts who testified at Boyle's habeas hearing. 93 F.3d at 186. Those

experts disagreed with the State's expert's analysis and interpretation of the evidence presented in Boyle's case. *Id.* The court stated that the fact that other experts disagree with the State's expert "is insufficient, by itself, to call the [State's expert's] testimony into question." *Id.*

¶155. The Court's prior determination that Dr. McGarry's testimony was within the scope of his expertise is a bar to a later claim that the testimony was false and that the prosecution knew it was false. Notwithstanding the bar, Galloway cannot establish that the prosecutor knew or should have known that Dr. McGarry's testimony was false because other experts disagree.

## IV. Juror Misconduct

### A. The death verdict was unconstitutionally coerced from a hold-out juror.

¶156. Galloway claims that his death sentence was the result of a group of jurors coercing a hold-out-for-life juror to abandon her convictions and vote for death. He asserts that Juror Tina Swanier did not want to vote for execution because, as a mother, she saw "loss from both sides." Galloway also asserts that Swanier ultimately voted for death not only after being exposed to media about the case, which will be discussed, but also after other jurors pressured her and told her that she would get prosecuted for contempt or perjury if she did not follow the oath she took. As support for these assertions, Galloway provided the affidavit of a paralegal who, along with post-conviction counsel, met with Swanier. According to the paralegal, Swanier later recounted that she "was threatened into agreeing

on that punishment that I didn't feel like was proper," and she "felt like that wasn't the sentencing that [she] agreed on," and she "felt like [her] voice meant nothing."  No reason is given for why Swanier would not provide an affidavit.[14]  The paralegal's affidavit is entirely hearsay. *See* Miss. R. Evid. 802.

¶157.  Mississippi Code Section 99-39-9(e) states:

> *Affidavits of the witnesses who will testify* and copies of documents or records that will be offered shall be attached to the motion. The affidavits of other persons and the copies of documents and records may be excused upon a showing, which shall be specifically detailed in the motion, of good cause why they cannot be obtained.

Miss. Code Ann. § 99-39-9(e) (Rev. 2020) (emphasis added).  In ***Smith v. State***, 877 So. 2d 369, 380 (Miss. 2004), the Court stated that "Miss. Code Ann. § 99-39-9(1)(e) allows the petitioner to present affidavits from witnesses who would testify at trial, not hearsay statements allegedly made by a juror to a third party."

¶158.  To further support his argument, Galloway points to the record to show that Swanier raised her hand during jury selection when asked if any prospective jurors opposed the death penalty.  According to the affidavit of Kathryn Gates, Juror Number 5, it surprised her and other jurors that "Tina" had been selected to serve.[15]  Gates further stated that the judge later questioned "Tina" by herself.  Gates also stated that two other jurors were "upset with Tina

---

[14]  Post-conviction counsel stated in the Petition that an attempt to obtain an affidavit directly from Swanier was unsuccessful, but they assure the Court that Swanier would be subpoenaed to testify.

[15]  According to Gates's affidavit, she cannot remember Tina's last name.

for not wanting to vote for the death penalty." According to Gates, she "finally, turned to Tina and reminded her of her oath to consider the death penalty." Gates stated, however, in her affidavit that she "told [Tina] she had the choice to vote for death or life, but that we had said we could vote for the death penalty."

¶159. Relying on the affidavit of Galloway's father, Red, it is asserted that Swanier recounted that she "was threatened into agreeing on that punishment that I didn't feel like was proper," she "felt like that wasn't the sentencing that [she] agreed on," and she "felt like [her] voice meant nothing." With regard to this claim, Red's affidavit is also pure hearsay. *See* Miss. R. Evid. 802.

¶160. Galloway asserts that the jurors who coerced Swanier into changing her decision created a violation of fundamental constitutional and statutory rules. Galloway cites no authority to support his assertion. He does, however, assert that more than one appellate court has noted the coercive effect of a judge's suggestion that a juror could be prosecuted or held in contempt for failing to follow her oath. *See **Kelsey v. United States***, 47 F.2d 453, 454 (5th Cir. 1931); ***Strickland v. State***, 348 So. 2d 1105, 1112 (Ala. Crim. App. 1977) ("Threatening a jury with contempt for failure to return a verdict constitutes reversible error." (citing ***Meadows v. State***, 62 So. 737 (Ala. 1913))). Here, however, the judge did not make that threat. Galloway provides no authority to support his argument that a fellow juror's statements regarding contempt, even if a step removed from the judge, similarly intimidated Swanier. The only juror affidavit provided in support of this claim is that of Gates. The

83

other affidavits are pure hearsay. And the only statement in Gates's affidavit that comes close to validating Galloway's claim is when she stated: "I remember there were two women . . . being upset with Tina for not wanting to vote for the death penalty. I remember her crying."

¶161. Further, Mississippi Rules of Evidence 606(b)(1) states:

> **(1) *Prohibited Testimony or Other Evidence.*** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Miss. R. Evid. 606(b)(1). The State contends that Gates's affidavit reflects her recollection of the jury's process and how Swanier behaved during deliberations. "Rule 606(b) is designed to protect 'all components of [a jury's] deliberations, including arguments, statements, discussions, mental and emotional reactions, votes and any other features of the process." Miss. R. Evid. 606 advisory comm. n. (alteration in original) (quoting Fed. R. Evid. 606 advisory comm. n.).

¶162. In rebuttal, Galloway points out that in ***Roach***, 116 So. 3d 126, Roach, who had been convicted on drug charges, was granted leave to proceed in the trial court on his claim that a juror had received outside information that influenced his verdict. ***Id.*** at 129. In that case, Juror Derrick Tate provided an affidavit stating that, during Roach's trial, Tate approached two police officers, who were witnesses for the State in Roach's trial, and asked them how much time Roach would receive if found guilty. ***Id.*** According to Tate's affidavit, the

officers informed him that "Roach would get five to eight years." *Id.* The trial court denied post-conviction relief, finding that Tate's testimony was unreliable. *Id.* at 130. The Court of Appeals affirmed, and this Court granted Roach's petition for writ of certiorari. *Id.* Ultimately, this Court affirmed, finding that the trial court's decision was not clearly erroneous. *Id.* at 135. But Galloway argues that Roach was granted leave to proceed in the trial court with his post-conviction relief claim based on the juror's affidavit.

¶163. Distinguishable from the today's case, *Roach* relied on extraneous information being presented to a juror. Rule 606(b)(2) of the Mississippi Rules of Evidence supplies the exception:

> **(2) *Exceptions.*** A juror may testify about whether:
>
> > **(A)** extraneous prejudicial information was improperly brought to the jury's attention; or
> >
> > **(B)** an outside influence was improperly brought to bear on any juror.

Miss. R. Evid. 606(b)(2). The issue in *Roach* dealt with extraneous evidence; here, there is no such claim and, pursuant to Rule 606(b)(1), no exception.

¶164. As to Galloway's claim his death sentence was coerced from a hold-out juror, the petition is denied.

> **B.      Whether a juror's exposure to media coverage portraying the beautiful, young victim violated Leslie Galloway's constitutional rights, injected improper victim-impact evidence, and requires reversal of his death sentence.**

¶165. The jury in Galloway's trial were sequestered at the Beau Rivage Casino Hotel in

Biloxi, Mississippi. Galloway asserts that on the morning of the final day of trial, September 24, 2010, the court, at the State's request, asked the jurors whether they had abided by its admonitions to avoid all news accounts of the trial. He further asserts that no one admitted noncompliance. Galloway claims, however, that Juror Swanier had watched a television news telecast about the case, because "she had to see the victim," and in doing so, saw photographs not admitted at trial showing "how pretty [Anderson] was." Galloway argues that Swanier's conduct rendered his trial fundamentally unfair.

¶166. To support this assertion, Galloway, again, has provided the affidavit of a paralegal who states that he accompanied post-conviction counsel Anna Arceneaux,[16] and he attests to what Swanier told them. According to the affidavit of yet another paralegal, all telephones were removed from the room, and the jurors were prevented from having access to newspapers, but the televisions remained in the rooms because they could not be easily moved. Further, the jurors were explicitly held to an "honor code" not to watch the local news stations about the case. The principle behind sequestering a jury "is to [e]nsure a fair and impartial jury that will return a verdict beyond reproach." *Simmons v. State*, 805 So. 2d 452, 506 (Miss. 2001).

¶167. The only affidavits Galloway provides to support his argument are from two paralegals attesting to what a juror said after trial. They are hearsay and not permitted. *See*

---

[16] On September 24, 2020, Attorney Arceneaux was permitted to withdraw as counsel for Galloway.

Miss. R. Evid. 802; ***Smith***, 877 So. 2d at 380; Miss. Code Ann. § 99-39-9(1)(e) (Rev. 2020).

¶168.   Further, as discussed above, Rule 606(b)(2)(A) and (B) permit a juror to testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Miss. R. Evid. 606(b)(2)(A), (B).   Here, however, Swanier's statement, if true, amounts to her testifying about her own misconduct. "Jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations." ***Payton v. State***, 897 So. 2d 921, 954 (Miss. 2003). Such testimony is prohibited by Rule 606(b).[17]

---

[17] Galloway argues in that, even to the extent that Rule 606(b) could be interpreted as barring Swanier's testimony, the Court should allow it because the Supreme Court has repeatedly rejected proposed applications of evidentiary rules that violate a defendant's rights. *See, e.g.*, ***Rock v. Arkansas***, 483 U.S. 44, 62, 107 S. Ct. 2704, 97 L.Ed. 22 (1987) (addressing whether a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony, the Supreme Court held that, in that case, "Arkansas' per se rule excluding all posthypnosis testimony infringes impermissibly on the right of a defendant to testify on his own behalf"); ***Chambers v. Mississippi***, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (Chambers was tried for a murder to which another person repeatedly had confessed in the presence of acquaintances. The State's hearsay rule, coupled with a "voucher" rule that did not allow the defendant to cross-examine the confessed murderer directly, prevented Chambers from introducing testimony concerning these confessions, which were critical to his defense.  The Supreme Court reversed the judgment of conviction, holding that when a state rule of evidence conflicts with the right to present witnesses, the rule may "not be applied mechanistically to defeat the ends of justice," but must meet the fundamental standards of due process.) ; ***Washington v. Texas***, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (Texas defendant was denied his right to have compulsory process for obtaining witnesses by statutes providing that principals, accomplices, or accessories in same crime cannot be introduced as witnesses for each other, thus denying defendant right to place on stand witness who was physically and mentally capable of testifying to events that he had personally observed and whose testimony would have been relevant and material to defense.)

¶169. Because Galloway has failed to support his argument with anything more than hearsay, the issue fails.

### C. Whether a juror's dishonest answer in voir dire created prejudicial error and requires reversal.

¶170. According to her juror information card, Gates responded by checking, "No" to the question of whether she had "ever served on a criminal jury." During voir dire, when Gates and other panelists were asked if any one of them had "ever served on a criminal jury before, raise your card," the record indicates that she did not.[18] According to her affidavit provided to Galloway, however, she stated: "I have served on many juries before, both civil and criminal, before I served on the jury in Mr. Galloway's case." Galloway asserts that Gates's lack of candor before the court denied him a fair and impartial capital jury and caused constitutional error that requires that Galloway's conviction and sentence be set aside.

¶171. In *Odom v. State*, 355 So. 2d 1381 (Miss. 1978), John Odom appealed asserting that the trial court erred by overruling his motion for a new trial, which was based upon the failure of a juror to respond to a question asked during the voir dire examination of the panel. *Id.* at 1382. Defense counsel asked the panel whether any of them had a close relative who had worked in law enforcement. *Id.* Juror John B. Freshour did not raise his hand. *Id.* There was testimony to the effect that Pete Freshour (the juror's brother) participated in the

---

[18] By the prosecutor: "All right. Anyone here who has ever served on a criminal jury before, raise your card. All right, if you will please hold your cards up until I call your numbers out, 17,27, 36, 32, 46, 62, 80, 93." Gates was Juror Number 8.

investigation of the case. *Id.* The Court established a three-part procedure for deciding a claim of juror dishonesty in voir dire. *Id.* at 1383. The court must determine (1) whether the question incorrectly answered was relevant; (2) whether the question incorrectly answered was unambiguous; and (3) whether the juror had knowledge of the information sought in the question. *Id.* "If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond." *Id.* "[E]ach case must be decided on an ad hoc basis considering the facts then before the court." *Id.* The *Odom* Court held:

> On the facts presented in this case, there is a strong inference of prejudice to defendant in his selection of a jury as any astute lawyer would have examined the juror closely with reference to the juror being the brother of a police officer and his feelings in that regard. Such examination in this case would have, in all probability, established that the juror's brother was in fact a policeman in the area where the crime for which appellant was being tried occurred, thus giving him a rational basis upon which to challenge the juror peremptorily, if not for cause.

*Id.*; *see also Magee v. State*, 124 So. 3d 64, 68 (Miss. 2013) ("Under the circumstances of this case, we cannot find that the trial judge clearly erred in concluding that [the juror] would not have been struck as a juror had the defense known she was a somewhat distant cousin of the arresting officer.").

¶172. Galloway argues that the question at issue here—"Anyone here who has ever served on a criminal jury before"—was relevant and unambiguous as the question prompted explicit answers from several panelists that they had served on prior juries. Galloway also argues that Gates proved by her sworn affidavit that she knew of her past jury service.

89

¶173. Galloway does not assert that he would have moved to strike Gates for cause. Even if he had, "a juror who may be removed on a challenge for cause is one against whom a cause for challenge exists that would likely [a]ffect his competency or his impartiality at trial." *Evans*, 725 So. 2d at 653 (internal quotation marks omitted) (quoting ***Billiot v. State***, 454 So. 2d 445, 457 (Miss. 1984), *cert. denied*, 469 U.S. 1230, 105 S. Ct. 1232, 84 L. Ed. 2d 369 (1985), *reh'g denied*, 470 U.S. 1089, 105 S. Ct. 1858, 85 L. Ed. 2d 154 (1985). Neither competency nor impartiality can be inferred simply by one's past experience on a jury.

¶174. Galloway does assert that prejudice could be inferred because he absolutely would have exercised a peremptory strike to remove Gates had he known of her past experience as a juror. The record belies this assertion, however.

¶175. The record indicates that the jurors who acknowledged that they had served on previous juries, Juror Number 17, Lauren Hughes, was the first to come up on the list of panel members, and she was accepted by both the prosecution and the defense. The next to be called was Juror Number 27, Jack R. Bethea, and he was stuck by the prosecution utilizing its third peremptory strike. The third and final juror to be called that had indicated having prior service as a juror was Juror Number 32, Shawn Sims, who was forced on the prosecution, having already used its one and only peremptory strike for alternates, and accepted by Galloway. Therefore, if there is any pattern to be discerned, it is that the State and Galloway each accepted one juror with prior experience as a juror (Juror Number 17), the State stuck one (Juror Number 27), and Galloway accepted one that he could have struck

(Juror Number 32). There is no way of knowing if the State would have used its peremptory strike on Juror Number 32 had it not already utilized it, but from this information, it appears that no deference was given by either side as to whether a juror had previously served as juror. And if there was, it appears that Galloway preferred jurors with past experience, as he accepted both that were presented to him during voir dire. Therefore, his assertion that he would have utilized a peremptory strike to remove Gates is dubious.

¶176. Further, despite the disparities between the information on Gates's juror information card and her silence during voir dire, as compared to her statements in her affidavit, Gates swore as a juror to "well and truly try the issue between the State of Mississippi and Leslie Galloway, the Third, and a true verdict render according to the evidence and the law, so help [her] God[.]" Further, it is presumed that Gates followed the instructions as they were given by the court. **Robinson v. State**, 247 So. 3d 1212, 1233 (Miss. 2018) ("Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." (Internal quotation marks omitted) (quoting **Parker v. Jones Cnty. Hosp.**, 549 So. 2d 443, 446 (Miss. 1989)).

¶177. We find that Galloway has failed to establish an inference of prejudiced in this case.

> **V.** **Whether forcing Galloway to wear an electronic restraint at trial violated his constitutional rights, warranting relief, or, at a minimum, an evidentiary hearing.**

¶178. Galloway asserts that, without the State's having made a record of any security rationale or the trial court's having weighed such security needs against Galloway's rights

to counsel and a fair trial, the security officers who held Galloway in custody placed a "stun belt"[19] on him throughout his trial. He argues that the electronic restraint threatened to shock him at any moment if he was deemed to be engaging in threatening behavior. He argues that the use of an electronic restraint can affect an accused's ability to confer with counsel and the jury, possibly, inferring his dangerousness. Galloway also asserts that the State never placed on the record what the court officers were secretly doing behind the scenes, and his lawyers, who knew about the electronic restraint, ineffectively failed to object. He maintains that these facts only surfaced through post-trial interviews with defense counsel.

¶179. Both Attorneys Stewart and Christensen were aware Galloway wore an electronic restraint during at least some stages of his trial. Because Galloway's counsel knew at the time of trial that Galloway wore the electronic restraint, the underlying issue was capable of being raised at trial. Therefore, the underlying issue is waived. Miss. Code Ann. § 99-39-21(1).

¶180. Galloway also asserts that his attorneys were ineffective for failing to object to his being made to wear an electronic restraint and to the State's failure to make a record of specific findings of fact to justify the use of the electronic restraint. In order to prevail on this claim, Galloway must demonstrate to this Court that his attorneys' performance was both

---

[19] The term "stun belt" comes from the affidavits provided by Attorneys Stewart and Christenesen. Galloway never describes how a "stun belt" is worn. In *Clark v. State*, 233 So. 3d 832, 848 (Miss. Ct. App. 2017), the defendant wore an electronic restraint or "stun pack" that was "attached to the defendant's upper leg."

92

deficient and that the deficiency prejudiced the defense of the case. *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Galloway can show neither.

¶181. Galloway relies on *Deck v. Missouri*, 544 U.S. 622, 633, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). In *Deck*, the defendant had been convicted of capital murder and sentenced to death. *Id.* at 625. During the new sentencing proceedings, Deck was shackled with leg irons, handcuffs, and a belly chain that were visible to the jury. *Id.* Defense counsel's objections were overruled, and Deck was again sentenced to death. *Id.* The Missouri Supreme Court rejected Deck's claims that shackling him violated Missouri law and the United States Constitution because the presumption of innocence was undermined at the sentencing proceedings. *Id.*

¶182. The Supreme Court granted certiorari on Deck's claim that his shackles violated the federal Constitution. *Id.* at 626. The Supreme Court first noted that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." The Supreme Court found the record to show that the jury saw the restraints, the trial court made no indisputable good reason for the shackles in the record, and the State failed to prove beyond a reasonable doubt

93

that shackling Deck did not contribute to the verdict. *Id.* at 634-35. In reaching its decision, the Supreme Court noted that:

> [T]he Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel. The use of physical restraints diminishes that right. Shackles can interfere with the accused's "ability to communicate" with his lawyer. Indeed, they can interfere with a defendant's ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf.

*Id.* at 631 (citations omitted).

¶183. The facts in *Deck* are distinguishable from Galloway's case. Where Deck wore leg irons, handcuffs, and a belly chain that were plainly visible to the jury, Galloway wore an electronic restraint under his clothes. There is no evidence that the jury saw the electronic restraint. Attorney Christensen stated in her affidavit:

> I remember that [Galloway] wore a stun belt during the trial. He was the first criminal defendant to wear the belt. The Harrison County Sheriff's Office had just gotten the belt. I saw the remote control for it at one point during the trial when the jury was out, but other than that, I did not see it. Leslie may have also worn foot shackles, but they would have been covered up by his pants.

¶184. Galloway argues that, while electronic restraint devices are generally not visible to a jury, their use raises the same or greater constitutional concerns than the Supreme Court outlined in *Deck* barring the routine use of visible shackles without security justification. Galloway states that "[a]t least one of these concerns (Mr. Galloway's ability to confer with counsel) and possibly the second (the jury's inferring dangerousness) are at issue here, and must be addressed further at a hearing."

94

¶185. While this Court has never addressed the use of an electronic restraint during a criminal trial, the Court of Appeals has. In ***Clark v. State***, 233 So. 3d at 832, 843, the defendant was convicted of capital murder, and he was sentenced as a violent habitual offender to life imprisonment without the possibility of parole. On direct appeal, Clark was permitted to file a pro se brief in addition to the brief filed by his counsel. As his first issue, Clark alleged that the trial court erred by requiring him to wear an electronic restraint. Regarding this issue, the Court of Appeals opined:

> In ***Jones v. State***, 130 So. 3d 519, 525–26 (¶ 21) (Miss. Ct. App. 2013), we reiterated that a defendant has a right "to be free from all manner of shackles or bonds . . . when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner." (Quoting ***Jones v. State***, 20 So. 3d 57, 60 (¶ 10) (Miss. Ct. App. 2009)). However, a trial judge has "considerable discretion regarding the decision to restrain a defendant," "based upon reasonable grounds for apprehension." ***Id.*** at 525–26 (¶ 21). A defendant whose rights have been violated may only have his conviction overturned if there is a showing that he suffered prejudice. ***Id.*** at 526 (¶ 21).

> Clark argues that his right to a fair trial was denied and that he was prejudiced by the Court's decision to require him to wear an electronic restraint (i.e., a "stun pack") during courtroom appearances. The State, in response, argues that the stun pack has previously been used "in certain cases when the courtroom security and the sheriff actually notify the Court that they have a concern," and that such a concern was clearly present in this case, as courtroom security and the sheriff recommended that Clark wear the restraint. Further, the State argues that the stun pack, which is attached to a defendant's upper leg, is not visible to the public when he is wearing pants and that it in no way hinders the ability of the defendant to testify or move about freely. Given these facts, we do not find that the trial judge erred in requiring Clark to wear the electronic restraint.

95

*Id.* at 848. Although Clark filed a petition for writ of certiorari in this Court, which was denied, he did not raise this issue. The Court takes this opportunity to adopt the Court of Appeals' holding on that issue.

¶186. Unlike in *Clark*, there is no indication in the record that the issue concerning the need for an electronic restraint was ever brought to the attention of the trial court by those responsible for securing Galloway during his trial. Galloway's counsel did not know why he was required to wear the electronic restraint. Neither *Clark* nor *Deck* addresses the need for adequate justification for using a restraint that a jury cannot see. The Court in *Deck* discussed the need for adequate justification for shackles seen by the jury. 544 U.S. at 634-35. The Court in *Clark* pointed out that there was a clear concern requiring the use of the device in that case. 233 So. 3d at 848. Regardless, even if we assume, for the sake of argument, that Galloway was unjustifiably retrained with the electronic device and his counsel were deficient for failing to protect his rights, Galloway has not shown prejudice. There is no proof, either in the record or by affidavit, that the jury ever saw his restraints. Further, Galloway provides no evidence that the device affectied his ability to communicate with his counsel, move freely, or participate in his trial in any way. To be sure, it has never been alleged that Galloway was ever shocked. Galloway states in his petition that "these errors were inherently prejudicial because of the *clear risk* of affecting Mr. Galloway's ability to communicate with counsel during his trial for his life." Galloway has not made a showing of prejudice, and this issue fails.

### VI. Whether executing Leslie Galloway, III, would violate the Eighth and Fourteenth Amendments to the United States Constitution.

¶187. Galloway claims his execution would violate the Eighth and Fourteenth Amendments because Mississippi's method of execution is inhumane, its death penalty is unconstitutionally arbitrary against black men, and the standards of decency principle has evolved to the point when the death penalty is no longer acceptable.

¶188. We already addressed and rejected on direct appeal Galloway's claim that "Mississippi's death-penalty scheme is applied in a discriminatory and irrational manner in violation of" both our federal and state constitutions. *Galloway*, 122 So. 3d at 680-81.

¶189. As to Galloway's contention that the death penalty is no longer acceptable under the evolving standards of decency principle, this is a policy argument for the legislature to consider. "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society." *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (internal quotation mark omitted) (1976) (quoting *Dennis v. United States*, 341 U.S. 494, 525, 71 S. Ct. 857, 95 L. Ed. 1137 (1951) (Frankfurter, J., concurring)). In applying the so-called evolving standards of decency principle in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), the Supreme Court categorically excluded mentally retarded individuals and juveniles from the death penalty. But the Supreme Court did not invalidate the death penalty itself. The Court subsequently and plainly reaffirmed "the principle, settled

97

by *Gregg*, that capital punishment is constitutional." *Baze v. Rees*, 553 U.S. 35, 47, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008) (citing *Gregg*, 428 U.S. at 177 (plurality opinion).

¶190. Lastly, Galloway claims that the three-drug lethal injection protocol set forth in Mississippi Code Section 99-19-51(1) (Supp. 2023) poses an unacceptable risk of significant pain that would violate Galloway's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, as well as article 3, section 28, of the Mississippi Constitution. Galloway contends that the availability of the necessary drugs used for lethal injections has been seriously restricted in recent years because drug manufacturers "don't want their drugs used to kill people." And while the Mississippi Department of Corrections (MDOC) has recently disclosed that it has acquired substitutes,[20] the State has refused to disclose whether any of the drugs it has acquired are compounded. Galloway submits that compounded drugs are not FDA approved and have not been evaluated for effectiveness and safety.

¶191. The Supreme Court has made it unequivocally clear that "'a requirement of all Eighth Amendment method-of-execution claims' alleging cruel pain" is that the prisoner must identify an "available alternative" method of execution. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1121, 203 L. Ed. 2d 521 (2019) (quoting *Glossip v. Gross*, 576 U.S. 863, 879, 135 S.

---

[20] In his PCR petition, Galloway says that in response to a federal lawsuit filed by Mississippi prisoners scheduled to be executed by the lethal injection, the State disclosed that MDOC "has acquired midazolam, in lieu of pentobarbital, as well as vecuronium bromide, and potassium chloride."

Ct. 2726, 192 L. Ed. 2d 761 (2015). "The death penalty is constitutional[,]" and "there must be a constitutional means of carrying it out." *Corrothers*, 255 So. 3d at 113 (quoting *Glossip*, 576 U.S. at 869).

¶192. Similar to the petitioner in *Corrothers*, Galloway did not identify in his PCR petition an alternative method of execution that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Id.* at 113 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 52). In his reply argument in support of his amended PCR petition, Galloway acknowledges that the Legislature amended Section 99-19-51 in 2022, as follows:

> (1)     At the discretion of the Commissioner, the Deputy Commissioner for Finance and Administration and the Deputy Commissioner for Institutions of the Mississippi Department of Corrections, the manner of inflicting the punishment of death shall be by one of the following: (a) intravenous injection of a substance or substances in a lethal quantity into the body; (b) nitrogen hypoxia; (c) electrocution; or (d) firing squad, until death is pronounced by the county coroner where the execution takes place or by a licensed physician according to accepted standards of medical practice. Upon receipt of the warrant of execution from the Mississippi Supreme Court, the Commissioner of Corrections shall, within seven (7) days, provide written notice to the condemned person of the manner of execution. It is the policy of the State of Mississippi that intravenous injection of a substance or substances in a lethal quantity into the body shall be the preferred method of execution.

Miss. Code Ann. § 99-19-51(1) (Supp. 2023).

¶193. But Galloway neither pleads nor proposes one of these alternatives. He simply says that "[t]he statute reflects the legislature's determination that nitrogen hypoxia, electrocution, and firing squad are feasible and readily implemented alternative to the State's use of

99

midazolam." This is facially insufficient to proceed on his constitutional claims under the Eighth Amendment and/or Mississippi's counterpart under article 3, section 28. As the Court in *Glossip* made clear, "the Eighth Amendment requires a prisoner to *plead* and prove a known and available alternative." *Glossip*, 576 U.S. at 880 (emphasis added). Galloway does neither. And consistent with *Corrothers*, his method-of-execution claim under our federal and state constitutions fails. *Corrothers*, 255 So. 3d 113-14.

### VII. Cumulative Error

¶194. Galloway asserts that each individual claim set forth above warrants post-conviction relief. He further asserts that the combined prejudicial effect of all these errors, taken together, requires reversal.

¶195. Galloway is entitled to a fair trial, not a perfect trial. *Sand v. State*, 467 So. 2d 907, 911 (Miss. 1985). The cumulative-error doctrine holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (Miss. 2007) (citing *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003); *Wilcher v. State*, 863 So. 2d at 836-37 ("It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." (internal quotations marks omitted) (quoting *Conner v. State*, 632 So. 2d 1239, 1278 (Miss.1993) , *overruled on other grounds by Weatherspoon*

*v. State*, 732 So. 2d 158 (Miss. 1999)).  After reviewing the record, briefs, and arguments, no individual errors require reversal of Galloway's conviction or sentence, nor does an aggregation of errors mandate a reversal.

¶196.  **POST-CONVICTION RELIEF DENIED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**